**In re CATAMOUNT DYERS, INC., Debtor.**

**Bankruptcy No. 82–160.**

United States Bankruptcy Court, D. Vermont.

Oct. 1, 1984.

Peter Banse, Rutland, Vt., for Tubular Textile Machinery,

David D. Robinson, Rutland, Vt., trustee.

---

## MEMORANDUM AND ORDER

CHARLES J. MARRO, Bankruptcy Judge.

Filed in 1982 as a business reorganization, this case was converted to a chapter 7 liquidation on March 13, 1984. Before conversion, the debtor (Catamount), a Vermont corporation, operated a fabrics manufacturing plant in Bennington, Vermont.

The instant matter is before the court on the motion of Tubular Textile Machinery (Tube-Tex) for relief from stay with respect to certain equipment formerly used by the debtor in its manufacturing operations. A preliminary hearing on the motion was held on June 7, 1984. At this hearing Tube-Tex consented to a continuation of the automatic stay pending the ruling of the court on the instant motion. On August 2, 1984, the parties stipulated to all relevant facts. The undisputed facts are as follows:

FACTS

During the period January 1974 to August 1978 the parties entered into a series of agreements self-characterized as leases of various pieces of machinery. The lease provides, *inter alia*, that:

(1) the term of three consecutive periods of three years each may be terminated by the lessee at the end of any period, on 60-day notice;

(2) Catamount shall bear all expenses of emplacement of the machine, including materials, parts, labor, freight ex-works, installation fee, and transportation and living expenses for personnel furnished by Tube-Tex in connection with the installation;

(3) after installation Catamount may at its expense move the machine from the installation site only upon prior express permission of Tube-Tex;

(4) Catamount shall reimburse Tube-Tex for any sales, use, or personal property tax incurred in connection with the delivery, use, or operation of the machine;

(5) each machine shall at all times be affixed with a plate stating that the machine is the property of and leased from Tube-Tex;

(6) excepting repairs occasioned within one year of installation due to inferior workmanship or materials, Catamount shall pay for all replacement parts and repairs including all shipping charges incurred in connection therewith;

(7) the machine and all of its parts including any and all replacement parts, changes, improvements, accessions, or add-ons to the machine shall be the sole and exclusive property of Tube-Tex;

(8) Tube-Tex shall have reasonable access to each machine "as the Lessor may deem necessary or desirable for the protection of its rights in the Machine;"

(9) Catamount shall at its expense obtain extended insurance coverage as to each machine and in the event of destruction or damage to any machine

the insurance proceeds shall be paid to Tube-Tex; and Catamount shall pay the costs of transportation to its plant of any replacement machine and of installation thereof;

(10) any failure by Catamount to fulfill any covenant or condition of the lease, or any event of bankruptcy, receivership or assignment for the benefit of creditors on the part of Catamount, or any devolution by operation of law of the machine to any person other than Catamount, shall constitute a default permitting Tube-Tex to terminate the lease on 15-day notice;

(11) at the expiration of the term of the lease or in the event of a truncated termination of the lease Catamount shall on demand, at its expense, deliver the machine to Tube-Tex at Tube-Tex's premises; alternatively, Tube-Tex may without instituting legal proceedings repossess the machine, at Catamount's expense, including disassembly, crating, shipping and other costs of removing the machine from Catamount's premises and delivering it to the premises of Tube-Tex;

(12) in the event of termination Catamount shall pay the rental agreed to be paid for the full term, and such unpaid remainder of the total rental for the full term shall become immediately due and payable upon demand notwithstanding that Tube-Tex may have repossessed the machine; and any termination shall release Tube-Tex of its obligations under the lease;

(13) the lease agreement shall not be mortgaged, assigned or underlet;

(14) Catamount shall indemnify and hold Tube-Tex harmless with respect to any personal injury or products liability claim arising out of Catamount's operation of the machine even if such claim is first asserted after termination of the lease agreement;

(15) the lease agreement is an intergrated writing containing the entire agreement between the parties; such agreement may not be modified without a writing; such agreement will be governed by the laws of the state of New York.

Clauses which vary from lease to lease include: (a) the price term and the identity of the machine; (b) the payment schedule; (c) the amount of extended insurance coverage to be obtained by Catamount. Additionally, certain of the leases provide that (i) Tube-Tex shall replace at its expense any parts of the machine which fail within one year due to inferior workmanship materials, and (ii) the lease shall take effect as to machinery as is, where is, with Catamount to bear the expenses of (A) disassembly and removal of the machine from the manufacturing premises of an identified third party, and (B) freight and other costs including customs duties if any incurred in connection with the shipment of the machine from the premises of the third party to the premises of Catamount.

Several of the leases provided that a substantial amount of the payments are to be paid either upon delivery of the equipment, or within the first few months of the agreement characterized as a lease and that such payments are to be secured by promissory notes.

Tube-Tex acknowledges the promissory notes and payment in full of each said note. All said notes were delivered to Catamount against payment and no longer in the possession of Tube-Tex.

As of April 30, 1984, unpaid invoices to Catamount from Tube-Tex for monthly payments and replacement parts amount to $38,488.96.

Tube-Tex is listed as an unsecured creditor in the schedules filed in connection with Catamount's petition for relief.

No financing statement was signed or filed with respect to any of the leases.

## DISCUSSION

The issue is whether the instant agreements are operating leases or capital leases; in other words, whether the instant documents represent true leases or, alternatively, installment sales. Whether an

agreement is a true lease or a security agreement is determined by the objective intent of the parties at formation. New York Consolidated Laws, Uniform Commercial Code (U.C.C.). § 9–102 Uniform Laws Comments. *See Matter of Anton's Lounge and Restaurant, Inc.,* 40 B.R. 134, 140 (Bankr.E.D.Mich.1984); *Sunset Enterprises, ·Inc. v. B & B Coal Co., Inc.,* 38 B.R. 712, 716 (W.D.Va.1984); *Matter of Brookside Drug Store, Inc.,* 3 B.R. 120, 122 (Bankr.D.Conn.1980) (court looks to contents of document as well as factual setting of transaction). *See also In re Kors, Inc.,* 13 B.R. 683 (Bankr.D.Vt.1981, *aff'd,* Civil Action No. 81–346 (D.Vt.1982) (court looks to language of document and treatment of agreement by parties).

■ Whether or not a self-characterized lease is a true lease or a security interest is a problem addressed by U.C.C. sections 9–102(1)(a) and 1–201(37). Section 9–102(1)(a) provides that U.C.C. section 9 applies to any transaction, regardless of its form, which is intended to create a security interest in personal property or fixtures. *See, National Equipment Rental, Ltd. v. Priority Electronics Corp.,* 435 F.Supp. 236 (E.D.N.Y.1977). Section 1–201(37) provides in part that whether a lease is intended as security is to be determined by the facts of each case. *See, In re Brothers Coach Corp.,* 9 U.C.C.Rep.Serv. 502 (E.D. N.Y.1971). The parties' subjective intent will not make a true lease of what is in effect a security agreement. *In re Sherwood Diversified Services, Inc.,* 382 F.Supp. 1359 (S.D.N.Y.1974); *accord, In re Fashion Optical Ltd.,* 653 F.2d 1385, 1390 (10th Cir.1981).

■ If the agreement's provisions suggest that the parties intended that the lessee acquire a proprietary interest in the property, the agreement in legal effect is one intended for security regardless of the form of the transaction or the name by which the parties may have christened it. *Matter of Anton's Lounge and Restaurant, supra,* 40 B.R. at 136. Conversely, if at the end of the lease term the lessor has the absolute right to retake control and use

the property, a true lease arrangement may be inferred. *In re Tulsa Port Warehouse Co., Inc.,* 690 F.2d 809 (10th Cir. 1982). However, the form and language of the agreement is not controlling, nor does any single clause or characteristic of the agreement control; the issue is whether under all the facts and circumstances, the effect of the provisions of the agreement indicates the objective intent to create an operating lease or to effectuate an installment sale. *In re Sherwood Diversified Services, Inc., supra.*

The cases scrutinize a number of factors to determine whether a self-denominated lease is in fact a "hidden" security agreement: whether (1) there is an option to purchase for a nominal sum at the end of the lease term, (2) the lease grants the lessee an equity or property interest, (3) the lessor's business is that of a financing agency, (4) the lessee pays sales tax incident to the acquisition, or pays all other taxes normally associated with ownership, (5) the lessee is responsible for comprehensive insurance, (6) the lessee is required to maintain the equipment at its expense, (7) the agreement places the risk of loss on the lessee, (8) the agreement permits the lessor to accelerate the payment of rent upon default, or provides the lessor with other remedies similar to those of a mortgagee, (9) the lessee is required to pay a substantial security deposit, (10) a financing statement is executed by the lessee in connection with the lease, (11) there are default provisions inordinately favorable to the lessor, (12) the lease provides for liquidated damages, (13) a lease provision disclaims warranties, (14) the aggregate rentals approximate the value of the subject matter of the lease. *See, Matter of Brookside Drug Store Inc., supra,* 3 B.R. at 123.

■ The cases pay attention to what the agreement does rather than what it formally says. *See, In re Brothers Coach Corp., supra.* Factors tending to indicate a true lease are: (a) existence of a purchase option price which approximates the market value at the time of exercise of the option; (b) rental charges that indicate an intention

to compensate the lessor for loss of value over the term of lease due to aging and obsolescence; (c) the rentals that are not excessive, and (d) the facts demonstrate that the lessee is acquiring no equity in the leased items during lease term. *See, In re Tucker,* 34 B.R. 257, 260, 261 (Bankr.W.D. Okla.1983).

■ Among the factors which tend to indicate that a so-called lease is a secured transaction are: (a) the lessee is required to obtain insurance in an amount roughly equivalent to the total rental payments; (b) the risk of loss and damage is placed on the lessee; (c) the lessee is required to pay for taxes, repairs, and maintenance; (d) default provisions provide for acceleration and repossession; (e) there is a substantial non-refundable deposit requirement; (f) the subject matter of the lease is to be acquired from or selected by a third party; (g) the rental payments are a reasonable equivalent of the cost of the items plus interest; (h) the lease is to be discounted with a bank; and (i) warranties generally found in a lease are excluded by the agreement. See, *In re Tucker, supra,* 34 B.R. at 261, and authorities cited.

■ The instant leases contain no purchase option at the expiration of the lease term, and Catamount expressly obtains no proprietary interest in the machinery during or after the life of the agreement. These two lease provisions would tend to indicate that the instant agreements are true leases. Moreover, Tube-Tex is not a finance agency. However, certain provisions of the instant agreements indicate that the agreements are intended to have the effect of security and therefore constitute secured transactions. There is no point to belabor the lease terms set forth *supra* in the statement of facts. In brief, Catamount bears all expenses of delivery, emplacement, maintenance, and taxes. The instant agreements require Catamount to insure the machines at roughly the full "lease" price during the life of the lease. In the event of default, Tube-Tex has the remedies normally incident to a mortgagee. The agreement excludes warranties normally incident to a lease. The default provisions are inordinately favorable to Tube-Tex. Further, several of the leases require substantial up-front payments upon execution of the agreement, delivery of the equipment, or within the first few months of the life of the agreement, and such payments were required to be secured by promissory notes (which notes in fact were paid in full and delivered against payment to Catamount prior to the end of the second year of the first of the three periods of three years each constituting the duration of the lease term). Certain of the leases expressly provide for payment of interest on such notes. Most of the leases provide for payment in full of the "rent" more than one year before the expiry of the first period of the term of the lease, excepting a nominal monthly rental charge to continue throughout the life of the "lease". With respect to the subject matter of certain leases, Catamount acquired the subject machinery "as is, where is" at the premises of third parties. As to one agreement, Catamount bore liability for customs duties in connection with the importation of the subject machine from Canada. Cumulatively, these factors compel the conclusion that the lease confers on Catamount the essential attributes of ownership consistent with a proprietary interest in the property, the formal language of the agreements notwithstanding. On balance, the only sensible interpretation of the provisions of these agreements is that secured transactions took place. The case is similar to *In re Tucker, supra,* where the court determined that the agreement at issue met virtually every test tending to indicate the lease was a secured transaction:

> The lease provides the lessee shall keep the equipment insured at full value for the term of the lease. The contract imposes risk of loss entirely on the lessee. The tax provisions of the lease place the burden of taxes, assessments and other governmental charges upon the lessee. Likewise, the lessor has no obligation to make any repairs or replacement of the equipment and the lessee bears the ex-

pense of all repairs, maintenance, operation and replacements. The default provisions give considerable leverage to the lessor .... The warranties section specifically disclaims any and all warranties and representations with respect to the equipment ....

*See also, In re Peacock*, 6 B.R. 922, 924 (Bankr.N.D.Tex.1980) (agreement that gives lessee the right to terminate the lease at any time during the lease term without any obligation for rents accruing during the remainder of the lease term should be · viewed as a true lease). The court is aware that the instant agreements give Tube-Tex the unconditional right to possession of the machinery at the termination or expiration of the lease. However, the fact that the agreements bind Catamount to pay monthly rental until the end of the term whether or not Tube-Tex repossesses the machinery in the event of default, constitutes an economic reality that permits a finding of an installment sale. *See, In re Fashion Optical, Ltd., supra.* As this forum noted in the case *In re Duprat*, 28 B.R. 109 (Bankr. D.Vt.1983),

> [T]he only fair conclusion is that a sale ... was intended with the seller reserving a lien for the balance of the purchase price [where] ... the debtor is responsible for all repairs, ... taxes and insurance. These are ordinarily the responsiblity of an owner.

*Id.* at 111; *accord, In re Wright Homes, Inc.*, 279 F.Supp. 598, 601 (M.D.N.C.1968).

■ The drafting of documents evidencing secured transactions hidden as lease agreements has undergone a metamorphosis of sophistication since this court had its first occasion to consider the problem in the case *In re Montain Carpet, Inc.*, 11 B.R. 729 (Bankr.D.Vt.1979). There, the court observed that the lessee "was not given any right to purchase the property, and, as a result, he could not have obtained any equity or pecuniary interest in the leased property. Therefore, the document in and of itself was a true lease." Later, in the case *In re Duprat, supra*, 28 B.R. at 111, this court observed that no single factor is determinative of the nature of the agreement. These and other cases decided by this court construe provisions of law identical to the New York statutes applicable in the instant case. Keeping pace with the developing law, the New York cases also hold that no single factor is determinative. Thus, the absence of a purchase option does not automatically render the agreements operating leases rather than capital leases, that is, rather than secured installment sales contracts. *See, Int'l. Paper Credit Corp. v. Columbia Wax Products Co., Inc.*, 28 U.C.C.Rep.Serv. 1484 (N.Y.Sup.Ct.1980) (agreement requiring lessee to maintain insurance coverage and to pay total rent upon default created security interest notwithstanding absence of purchase option). In sum, there is at best an illusory reality to the argument that the absence of a purchase option in conjunction with the obligation of Catamount to redeliver each machine at the end of the lease term, require a finding that the agreements are true leases.

The hard fact is that the agreements obligate Catamount to pay, as follows, the total nine-year price reflected in the payment schedule incident to each agreement regardless of whether the agreement runs to term or is prematurely terminated:

| AGREEMENT | DOLLARS PAYABLE | | PER PERIOD | TOTAL PRICE IN ANY EVENT |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | |
| 01/22/74 | 9,900 | 5,400 | 5,400 | 19,700 |
| 11/01/76 | 31,470* | 7,200 | 7,200 | 45,870* |
| 11/02/76 | 81,000* | 8,460 | 8,460 | 97,920* |
| 11/03/76 | 23,150* | 7,200 | 7,200 | 37,550* |

| AGREEMENT | DOLLARS | PAYABLE | PER PERIOD | TOTAL PRICE IN ANY EVENT |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | |
| 05/25/78 | 8,500 | 4,500 | 4,500 | 17,500 |
| 08/28/78 | 5,400 | 5,400 | 5,400 | 16,200 |

\* plus certain interest payments.

The fact that substantial payments may be scheduled during the second and third periods is not significant when it is remembered that at formation of the agreements Catamount obligated itself to pay the full extent of each total price, provided only that Tube-Tex deliver the subject equipment. Viewed in this light, the timing of the pay-down does not lend credibility or weight to the proposition that at formation true leases were intended. To the contrary, the well-crafted boilerplate constituting the agreements has the legal effect of front-loading an installment sale and purchase agreement.

This court is of the opinion that the documents in the case establish that all revelant transactions were sales and not leases. To overcome the presumption of sale established by the agreements, Tube-Tex could have proved no-sale by presenting course-of-performance evidence such as whether the machines bore the identification plates required by the agreements, or whether any title, shipping, storage, delivery or insurance documents show Tube-Tex as owner. Instead, Tube-Tex submits format paper facts which do not establish that Tube-Tex has a lessor's interest in the machines.

For the reason that the instant agreements are security agreements rather than leases, Catamount obtained an interest in the subject matter, which interest became part of the estate upon the filing of the petition for relief. *See*, Code § 541(a). For the reason that Tube-Tex filed no financing statements in connection with any of the agreements, Tube-Tex held unperfected security interests in the identified machinery as of the date Catamount filed for reorganization, and as of the date the case was converted to a chapter 7 liquidation. Opposing Tube-Tex on the instant motion is the bankruptcy trustee, who holds interests in the identified machinery that are senior to the unperfected liens of Tube-Tex. *See*, Code § 544(a). As the trustee claims the property on behalf of the estate, Tube-Tex may not prevail on its motion for relief from stay.

## ORDER

Upon the foregoing,

IT IS ORDERED, that the motion of Tubular Textile Machinery for relief from stay is DENIED.