**In re SPRECHER BROTHERS LIVE-STOCK & GRAIN, LTD., a South Dakota Corporation, Joel Kim Sprecher and Nancy Faye Sprecher, and Gene Alan Sprecher, Debtors.**

**Bankruptcy Nos. 484–00181, 484–00361 and 484–00362.**

United States Bankruptcy Court, D. South Dakota.

March 5, 1986.

Brent A. Wilbur, May, Adam, Gerdes & Thompson, Pierre, S.D., for creditor/movant IFG Leasing Co.

Max A. Gors, Gors, Braun, Carlon, Smith and Zastrow, Pierre, S.D., for debtors/respondents Sprecher Bros. Livestock & Grain, Ltd., Joel Kim Sprecher, Nancy Faye Sprecher, and Gene Alan Sprecher.

## MEMORANDUM DECISION

PEDER K. ECKER, Bankruptcy Judge.

### Introduction

This matter is before the Court on a resistance to motion for determination of extent and validity of liens and motion to determine acceptance or rejection of executory contract filed on behalf of Sprecher Brothers Livestock & Grain, Ltd., Joel Kim Sprecher, Nancy Faye Sprecher, and Gene Alan Sprecher ("Debtors")[1] by Attorney Max A. Gors, Pierre, South Dakota, on

April 26, 1985.[2] Debtors substantively allege that the two agreements which were entered into between IFG Leasing Company ("IFG") and the debtors are not true leases, but intended as security. Attorney Brent A. Wilbur represented IFG. Hearings on this were held on both May 29, 1985, and September 10, 1985, in Pierre, South Dakota. The Court subsequently requested additional information. In response, the parties filed a stipulation to certain facts on January 23, 1986.

### Background

Two agreements, entitled "Lease," which were entered into between IFG and the debtors, are at issue. Other than payment and time of execution, the terms in the agreements are identical. One agreement involves a nursery-grower with an office which is 24' by 50' and a concrete pit which is 24' by 50' by 6' (herein "nursery-grower agreement"). The other involves two modified open front finishing buildings, one which is 36' by 60' and the other 36' by 30'. These buildings and concrete pit are used by the debtors in their hog raising operations. Construction was performed by TASCO, Inc., of Shell Rock, Iowa, who is both IFG's supplier and its agent.

The nursery-grower agreement was executed between the parties on April 24, 1980. According to agreement,[3] the debtors were entitled to use the nursery-grower and concrete pit for a seven-year period conditioned on the following payment schedule:

There will be 7 rental payments made on an ANNUAL basis ... The rental payments due under this Lease will be adjusted in accordance with the changes in the prime lending rate of Citibank, N.A. in arrears. The rental payments will be

---

1. The debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 29, 1984.

2. The resistance was in response to a motion for determination of extent and validity of liens and motion to determine acceptance or rejection of executory contract filed on behalf of IFG Leasing Company by Attorney Brent Wilbur on February 22, 1985. Although the determination of

extent and validity of liens matter is an adversary proceeding properly commenced by a complaint rather than a motion, the parties agreed to have the matter heard by the Court.

3. Under paragraph 15, the debtors agreed that, upon expiration, they would return the "equipment" in good repair and at their expense to IFG Leasing.

adjusted for each ¼ of 1% change in said prime lending rate at a factor of .115% of the cost of equipment, which for the purpose hereof is established at $62,600.00. On the commencement date of this Lease, the prime lending rate is 19½% and the initial rental payment is $15,646.24. In the event the prime lending rate is at or below 12% the rental payments will remain constant.

Under this schedule, the payout over the seven years is $62,600.00 plus applicable interest. On the execution date, the nursery-grower and concrete pit had a retail value of $62,600.00.

On January 5, 1983, the parties both extended the expiration date and modified the payment schedule as follows:[4]

"A total accounts receivable balance of $77,772.24 will be paid as follows:

Starting February 1, 1983, 84 monthly payments of $925.86 continueing (sic) until January 1, 1990."

On this date, the nursery-grower and concrete pit had an in-place value of $40,000.00 and liquidation value of $25,000.00.

The finishing buildings agreement was executed between the parties on September 26, 1980. According to the agreement, the debtors were entitled to use the two modified open front finishing buildings for a seven-year period conditioned on the following payment schedule:

There will be 7 rental payment(s) of $26,020.80 each. Rental payments shall be made annually. The first rental payment shall be due on September 26, 1980 with subsequent rental payments commencing September 25, 1981. The first one ... being payable at the time of [the] signing [of] this lease in the total amount of $26,020.80 dollars.

Under this schedule, the payout over the seven-year period is $182,145.60. On the execution date, the retail value of the two finishing buildings was $119,949.13.

On January 5, 1983, the parties both extended the expiration date and modified the payment schedule as follows:[5]

"A total accounts receivable balance of $157,492.44 will be paid as follows:

Starting February 1, 1983, 84 monthly payments of $1,874.91 continueing (sic) until January 1, 1990."

On this date, the two buildings had an in-place value of $40,000.00 and liquidation value of $25,000.00.

According to the terms, both agreements provide that:

1) Debtors bear risk of loss;[6]

2) Debtors provide comprehensive insurance against loss, theft, damage, or destruction;[7]

---

**4.** Although paragraph 5 was cited in addendum as the basis for modification, the parties stipulated that this was not the basis. Paragraph 5 provides that "Any controversy or claim arising out of or relating to this contract or the breach thereof, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association and judgment upon the award rendered by the arbitrator(s) may be entered in any Court having jurisdiction thereof." No explanation for this modification was provided to the Court.

**5.** See n. 4.

**6.** Paragraph 7, in pertinent part, reads as follows:

In the event of loss or damage, lessee at the option of lessor, shall (a) at lessee's expense, repair the same to the satisfaction of lessor; or (b) at lessee's expense, and to the satisfaction of lessor, replace the same with similar or like equipment in good condition and repair and of comparable value, with clear title thereto in lessor; or (c) make payment to the lessor the total of the amounts specified below:

(1) All rental payments past due or currently owed to lessor under this lease, including unpaid taxes, and

(2) All future rental payments that would accrue over the remaining term of this lease. Upon lessor's receipt of the payment specified by subsections (1) and (2) above, lessee shall be entitled to whatever interest lessor may have in said equipment, in its then condition and location, without warranty express or implied. The parties hereto agree that the sum of the amount required by subsections (1) and (2) will equal the total amount payable to lessor in the event of "loss or damage."

**7.** Paragraph 8 reads as follows:

INSURANCE. Lessee shall provide and maintain insurance against loss, theft, damage, or destruction of the equipment in an amount not less than the total cost of equipment here-

3) Debtors pay all charges, taxes,[8] and maintenance;[9]

4) Debtors may earn equity in the buildings or concrete pit;[10]

under, with the lessor as "additional insured as respects" the equipment. Lessor may apply the proceeds of said insurance to replace or repair the equipment and/or satisfy lessee's obligation hereunder. Lessee also shall provide and maintain comprehensive general liability insurance including but not limited to contractual liability, insuring the lessor and lessee, with a severability of interest endorsement or its equivalent, against any loss or liability for damages, either to persons or property, which might result from or happen in connection with the condition, use or operation of the equipment, with such limits and with an insurer satisfactory to lessor. Each policy shall expressly provide that said insurance as to lessor and its assignees shall not be invalidated by any act, omission, or neglect of lessee and cannot be cancelled without ten (10) days written notice to lessor. As to each policy, lessee shall furnish lessor a certificate of insurance from the insurer which said certificate shall reflect and evidence the insurance coverage required by this paragraph. If lessee fails to procure or maintain said insurance, lessor shall have the right, but shall not be obligated, to effect such insurance, or pay said charges. In that event, lessee shall repay to lessor the costs thereof with the next payment of rent.

**8.** Paragraph 12 reads as follows:

TAXES: Lessee agrees to pay any and all taxes, assessments or other charges levied or assessed on or with respect to the equipment or its use, value or ownership thereof, whether during the term of the lease or thereafter if applicable to the term of the lease or reimburse the lessor forthwith (as additional rental hereunder) if lessor paid the same, to prepare and/or file schedules, required by taxing authorities in connection therewith and to provide permits, licenses, if any, necessary for installation or operation.

**9.** Paragraph 14, in pertinent part, reads as follows:

"Lessee shall at its sole expense, maintain the equipment in good repair, appearance, and functional order. . . ."

**10.** *See* n. 6. In the event of loss or damage, the debtor may become the owner upon full payment according to the payment schedules.

**11.** Paragraph 20 reads as follows:

DEFAULT: (A) The occurrence of any of the following events shall constitute an event of default ("Event of Default") hereunder:

5) IFG may, on default by the debtors, accelerate all payments;[11] and

6) All express or implied warranties of fitness and merchantability are excluded.[12]

(1) Default in the payment when due of any rental payments or on any other indebtedness at any time due under this lease; or
(2) Failure to perform or observe according to its terms any other covenant contained in this lease, or any other instrument or document which may have been executed in connection with this lease; or
(3) The filing of a voluntary or involuntary petition in bankruptcy by or against the lessee or the the (sic) appointment of a receiver for any of the lessee's assets; or
(4) An assignment by the lessee for the benefit of creditors.
(B) Upon the occurrence of any Event of Default, lessor shall have the following rights and remedies which shall be cumulative and which may be exercised with or without notice, and which may be exercised separately, independently or concurrently and more than once and in any order, and without any election of remedies to be deemed made, and without affecting the right of lessor to exercise any other remedy hereunder or which lessor may have in law, and without regard to other remedies then, theretofore or thereafter pursued or being pursued:
(1) To declare the total rental payments under this lease immediately due and payable;
(2) To take immediate possession, management and control of the equipment and to repair and maintain the same at the expense of lessee and to perform such acts thereon or in connection therewith as lessor may deem necessary or desirable;
(3) To sell, rent or lease the equipment without notice to the lessee, and apply the net proceeds thereof to the lessee's account;
(4) Commence the appropriate action as is indicated in paragraph five (5) of this contract to recover the unpaid balance of this lease, unpaid taxes and either the equipment or its fair market value;
(5) Charge the lessee for all costs and expenses of collection, including a reasonable attorney's fee.

**12.** Paragraph 3 reads as follows:

THERE ARE NO WARRANTIES BY LESSOR Lessee, by his signature below states:
a. That he has examined the property leased as fully as he desires.
b. That he understands that lessor does not warrant the fitness or the merchantability of the property leased.
c. That he leases the property "As Is", "With All Faults".
d. That there are no other warranties extended by lessor.

Neither agreement included any purchase option or title transfer provision.[13] Also, in the Fall of 1980, IFG filed two financing statements which covered the nursery-grower with office, the concrete pit, and the two finishing buildings in the Beadle County, South Dakota, recorder's office.

The debtors also contend that, because the buildings and concrete pit are "fixtures," this is indicative that both agreements were intended as security. The Court is unsure as to what the debtors intended by this argument. Nevertheless, there are only two reasonably possible meanings: 1) Whether, as a matter of law, a "lease" is intended as security when purportedly leased property has become a fixture prior to the expiration of the agreement; or 2) Whether, as a matter of fact, a "lease" agreement is intended as security when purportedly leased property has become a fixture prior to the expiration of the agreement.

In response, IFG insisted that it often removes these types of property and sells them by auction. In support of this, IFG provided numerous pictures showing both the removing and transporting of similar property.

*Legal Issues*

The fundamental issues raised are: 1) Whether the terms of the "lease" agreement create a security interest; and 2) If so, whether IFG had a perfected security interest in the nursery-grower, the concrete pit, or the two finishing buildings on the date which the debtors filed for relief under Chapter 11 of the Bankruptcy Code.

*Law*

*A.  First Issue*

As to the first issue, the Court finds that, under South Dakota law, the terms of the "lease" agreements create a security interest, and the Court, therefore, holds that neither of the leases are true leases but are financing arrangements which are disguised as leases.

Because the first issue resolves this matter, the Court finds it unnecessary to address the debtors' "fixture" arguments. Prior to discussing the first issue, the Court, however, notes that:

1) No case was either offered or found as standing for the proposition that, as a matter of law, a lease is intended as security when the purportedly leased property has become a fixture prior to the expiration of the agreement; and

2) Although some courts have considered a property's "fixture" status as one of many factors considered in determining that a lease was intended as security, no case was either offered or found in which a court relied solely on "fixture" status. *See WOCO v. Benjamin Franklin Corp.,* 20 U.C.C. 1015 (D.N.H.1976), *aff'd,* 562 F.2d 1339 (1st Cir.1977); *Meeker v. Fowler,* 35 Ill.App.3d 313, 341 N.E.2d 412 (1976).

The Bankruptcy Code defines "security interest" as a lien created by agreement. 11 U.S.C. § 101(43). It does not define "lease." The legislative history states that state or local law should be applied in determining whether a lease constitutes a security interest under the Bankruptcy Code. H.R.Rep. No. 595, 95th Cong., 1st

---

e.  That the property leased is for commercial or business uses.

f.  In the event of any claim concerning the location, installation, repair or use of the property leased or in any claim in any way otherwise concerning the property leased, regardless of cause or consequence, lessee's only remedy, if any, is against the supplier of the equipment above or the manufacturer.

g.  That any warranties make (sic) by the supplier of equipment above to IFG Leasing

Company are granted and assigned by IFG Leasing Company to Lessee.

h.  That no defect, regardless the cause or consequence, shall relieve lessee from performance of this lease including rental payments.

13.  At the September 10, 1985, hearing, the debtors insisted that one of IFG's agents represented that it was a common practice to sell the property for ten per cent at the expiration of the agreement.

Sess. 313–314, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787.

The principal state law on this question is found in the South Dakota Uniform Commercial Code. Article 9 includes all transactions, regardless of their form, that are "intended to create a security interest in personal property or fixtures." S.D.C.L. § 57A–9–102(1)(a). To this end, Section 9–102(2) provides that Article 9 "applies to security interests created by contract including ... leases ... intended as security." This specific reference to leases makes it clear that Article 9 applies to transactions that, while disguised as leases, are, in effect, sales or conditional sales from the "lessor" to the "lessee." *See American Standard Credit v. National Cement Co.,* 643 F.2d 248, 260 (5th Cir. 1981).

The South Dakota Code provides, in pertinent part, the following definition of "security interest":

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (section 2–401) is limited in effect to a reservation of a "security interest." ... Unless a lease ... is intended as security, reservation of title thereunder is not a "security interest" .... Whether a lease is intended as security is to be determined by the facts of each case; however, (1) the inclusion of an option to

purchase does not of itself make the lease one intended for security, and (2) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

S.D.C.L. § 57A–1–201(37).

South Dakota case law on the issue of whether a "lease" agreement is a true lease is limited. The South Dakota Supreme Court, citing *American Standard Credit* [14] with approval, recently held that a true lease exists when there is a purchase option for fair market value and rental charges only compensate for loss of value on the lease term due to obsolescence, wear, and aging. *NBC Leasing Co. v. Stilwell,* [15] 334 N.W.2d 496, 499 (S.D.1983). While not including "lease" designation, the Court noted the following as additional indicators of a true lease:

1) Rental payments which are not excessive;

2) Option purchase prices which are not unduly low; and

3) A lessee does not acquire any equity in the leased equipment during the term of the lease.

*Stilwell, Id.*

Consistent with the *American Standard Credit* court [16] and many other courts,[17] this Court holds that an absence

---

**14.** 643 F.2d 248 (5th Cir.1981).

**15.** In *NBC Leasing,* the South Dakota Supreme Court, while considering a usury matter, addressed the question of whether a farm irrigation contract is a disguised financing arrangement rather than a true lease. The agreement's terms required that the lessees make seven annual payments of $4,775.73 with the title remaining with the leasing company. Upon termination, the system was to be returned to the leasing company unless the lessees purchased the property for the fair market value. The leasing company retained the right to depreciate the property. The lessees were required to insure the system and pay any taxes. While acknowledging some factors as indicative of a financing arrangement, the Court held that this

is a true lease because the option to purchase is for the fair market value and the rental charges show an indication to compensate the lessor for loss of value over the lease term due to obsolescence, wear, and aging. 334 N.W.2d at 498–99.

**16.** *American Standard Credit,* 643 F.2d at 262.

**17.** *In re Tulsa Port Warehouse Co.,* 4 B.R. 801, *aff'd,* 690 F.2d 809, 811 (10th Cir.1982); *Matter of Fashion Optical, Ltd.,* 653 F.2d 1385, 1389 (10th Cir.1981); *Matter of Tillery,* 571 F.2d 1361, 1366 (5th Cir.1978); *Towe Farms, Inc. v. Central Iowa Production Credit Association,* 528 F.Supp. 500, 503 (S.D.Iowa 1981); *Leasing Service Corp. v. National Bank and Trust,* 19 U.C.C.Rep. 252, 259 (D.N.J.1976); *In re Noack,* 44 B.R. 172, 175

of an explicit option to purchase as part of a lease does not negate the possibility that the lease is intended for security. Exclusion of an option to purchase, however, is an important consideration. *See American Standard Credit*, 643 F.2d at 262–63; *In re Niemi*, 27 B.R. at 218.

Based on the foregoing, the Court adopts a two-tier analysis for determining whether a lease is intended as security. *See In re J.A. Thompson and Son, Inc.*, 665 F.2d 941, 945–47 (9th Cir.1982); *Matter of Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1141–43 (7th Cir.1982); *Percival Const. Co. v. Miller and Miller Auctioneers*, 532 F.2d 166, 171–72 (10th Cir.1976).

The first question to be answered is whether the lessee may obtain the property for no additional or nominal consideration. If so, it is conclusively presumed that the lease is intended for security. *In re J.A. Thompson and Son, Inc.*, 665 F.2d 941, 946–47 (9th Cir.1982); *Matter of Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1142 (7th Cir.1982); *Matter of Fashion Optical, Ltd.*, 653 F.2d 1385, 1388 (10th Cir.1981). If not, the question then becomes whether, under the facts of this case, the lease is intended as security.[18]

Before delineating the factors appropriate to a facts-of-a-case analysis, it is necessary to determine whether the agreement provides that, upon compliance with the terms of the lease, the lessee shall become or has the option to become the owner of the property for no additional or nominal consideration. In the instant case, neither agreement included any purchase option nor title transfer provision. Moreover, al-

though one of the debtors insisted that one of IFG's agents informed him that it was a common practice to sell the property at expiration for ten per cent, no proof was offered to show that IFG promised to sell any of the buildings or concrete pit to the debtors. Nor was proof offered to show that the debtors may have detrimentally relied on any agent representation. Because of this, the Court finds that the debtors neither had become nor had the option to become the owners of any of the buildings or concrete pit for no additional or nominal consideration.

The issue now becomes whether, under the facts of this case, the lease is intended as security. An objective test is applied for resolving this issue. *See NBC Leasing Co. v. Stilwell*, 334 N.W.2d 496, 499 (S.D.1983); *Percival Const. Co. v. Miller and Miller Auctioneers*, 532 F.2d 166, 171 (10th Cir. 1976); *In re Air Vermont, Inc.*, 44 B.R. 440, 443 (Bkrtcy.D.Vt.1984); *In re Winckler*, 38 B.R. 103, 105 (Bkrtcy.D.N.D.1984); *In re Tucker*, 34 B.R. 257 (Bkrtcy.W.D. Okla.1983); *In re Shangri-La Nursing Center, Inc.*, 31 B.R. 367, 372 (Bkrtcy.E.D. N.Y.1983); *In re Niemi*, 27 B.R. 215, 218 (Bkrtcy.D.Or.1982); *In re Coors of the Cumberland, Inc.*, 19 B.R. 313 (Bkrtcy.M. D.Tenn.1982); *In re Brookside Drug Store, Inc.*, 3 B.R. 120, 122–23 (Bkrtcy.D. Conn.1980).

The question becomes what objective criteria may be used. As suggested before, South Dakota case law provides little assistance.[19] *See NBC Leasing Co.*, 334 N.W.2d at 496. After extensive review

---

(Bkrtcy.E.D.Wis.1984); *In re Catamount Dyers, Inc.*, 43 B.R. 564, 568–69 (Bkrtcy.D.Vt.1984); *In re Witkowski*, 37 B.R. 352, 353 (Bkrtcy.D.N.D. 1984); *In re Niemi*, 27 B.R. 215, 219 (Bkrtcy.D. Or.1982); *In re Gehrke Enterprises, Inc.*, 1 B.R. 647, 651 (Bkrtcy.W.D.Wis.1979); *Las Vegas Auto Leasing, Inc. v. Davis*, 98 Nev. 169, 643 P.2d 1217, 1218 (1982); *Int'l Paper Credit Corp. v. Columbia Wax Products Co., Inc.*, 28 U.C.C.Rep. 1484, 1485 (N.Y.S.Ct.1980); *P.M. Leasing Services, Inc. v. Homestead Fabrics, Inc.*, 18 U.C.C.Rep. 1342, 1344 (N.Y.S.Ct.1976).

**18.** The Ninth Circuit holds that the question of whether a lease is "intended as security" is de-

termined by reference to the intention of the parties at the time the transaction is consummated. *In re J.A. Thompson and Son, Inc.*, 665 F.2d 941, 946 (9th Cir.1982); *see also In re Air Vermont*, 44 B.R. 440, 443 (Bkrtcy.D.Vt.1984).

**19.** In *NBC Leasing Company*, the South Dakota Supreme Court suggests two objective factors. They are whether the lessee acquires any equity during the term of the lease and whether rental payments are reasonable in view of loss of value over the lease term due to obsolescence, wear, and aging (whether the rental payments are excessive). 334 N.W.2d at 499; *see also* n. 15.

of the case law in the area,[20] the Court, in addition to whether there is a purchase option, may consider the following factors to assist it in determining whether a lease is intended as a security interest. They are:

1) Whether the lessee acquires any equity in the equipment;

2) The lessor's requirement of a guaranty or indemnity agreement executed by a third party;

3) Payment of all taxes, insurance, and expenses by the lessee;

4) Payment of a substantial nonrefundable security deposit by the lessee (downpayments);

5) Lack of evidence showing the lessor handled any volume of equipment;

6) Absence of storage facilities or handling procedures by the lessor;

7) Whether there is a provision for acceleration of rent payments and granted remedies similar to those of a mortgagee;

8) Whether all express or implied warranties of fitness are excluded; and

9) Whether the payments are reasonable in view of loss of value over the lease term due to obsolescence, wear, and aging (rental payments are not excessive).

■ In the instant case, the important no-purchase-option factor must be balanced against the following factors:

1) Under both agreements, the debtors may obtain equity in the buildings and concrete pit in the event of loss or damage;

2) Under both agreements, the debtors must pay all taxes, insurance, and expenses;

3) Under both agreements, the debtors must make a nonrefundable substantial downpayment;[21]

4) According to both agreements, TASCO, Inc., supplied materials and constructed the buildings and concrete pit;

5) Under the terms of both agreements, there is a provision for acceleration of rent payments, and IFG is granted remedies similar to those of a mortgagee (i.e., to take immediate possession; or to sell, lease, or rent without notice);

6) Under the terms of both agreements, all express and implied warranties are excluded; and

7) Under the terms of both agreements, the rental payments are excessive.

In this latter connection, although on the date of execution the retail value of the nursery-grower and concrete pit was $62,600, the scheduled payout over seven years was $62,600 plus applicable interest. The applicable interest on the date of execution was 19½ per cent with a minimum interest rate set at 12 per cent. Because the debtors are required to pay the full retail value of the property at a minimum of 12 per cent interest, the Court finds this as excessive rental payments. This finding does not change in view of the January 5, 1983, payment modification. Although on this date the in-place value of the nursery-grower and concrete pit was $40,000, the payout over the next seven years was $77,772.24.

Although on the date of execution the retail value of the two finishing buildings was $119,949.13, the payout over seven years was $182,145.60. Because the debtors are required to pay $62,196.47 in addition to the full retail value over a seven-year period, the Court finds this as excessive rental payments. This finding does not change in view of the January 5, 1983, modification. Although on this date the in-place value of the two finishing buildings was $40,000, the payout over the next seven years was $157,492.44.

Thus, the Court finds that these factors are indicative of a lease intended as security within the meaning of U.C.C. Section 1–201(37), Section 9–102(1)(a), and applicable case law. S.D.C.L. § 57A–1–201(37); S.D.C.L. § 57A–9–102(1)(a). The Court, therefore, holds that neither of the leases

**20.** *See* nn. 16 & 17.

**21.** Both agreements required substantial nonrefundable downpayments on the execution date.

The nursery-grower agreement required a payment of $15,646.24 and the finishing buildings agreement a payment of $26,020.80.

are true leases, but are intended as security.[22]

### B. Second Issue

■ As to the second issue, the Court finds that IFG had a perfected security interest in the nursery-grower with office, the concrete pit, and the two finishing buildings on the date the debtors filed for relief under Chapter 11 of the Bankruptcy Code.

U.C.C. Section 9–408 provides in pertinent part that:

A ... lessor of goods [23] may file a financing statement using the [term] ... "lessor," instead of the terms specified in § 57A–9–102. The provisions of this part shall apply as appropriate to such a financing statement but its filing shall not of itself be a factor in determining whether or not the ... lease is intended as security (§ 57A–1–201(37)). However, if it is determined for other reasons that the ... lease is so intended, a security interest of the ... lessor which attaches to the ... leased goods is perfected by such filing.

*See* S.D.C.L. § 57A–9–408.

In the instant case, IFG properly filed two financing statements [24] which covered the nursery-grower with office, the concrete pit, and the two finishing buildings with the Beadle County, South Dakota, Register of Deeds. *See* Section 57A–9–401.[25] Both were filed in the Fall of 1980.

Because the Court finds that the financing statements which covered the property in question were properly filed in 1980 and that U.C.C. Section 9–408 provides for perfection on the date of the filing of the financing statements, the Court, therefore, holds that IFG had a perfected security interest in the nursery-grower, the concrete pit, and the two finishing buildings on May 29, 1984, the date which the debtors filed for relief under Chapter 11 of the Bankruptcy Code.[26]

Accordingly, based on the foregoing, this Memorandum Decision constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Bankr.R.P. 7052 and 9014 and F.R.Civ.P. 52. Counsel for the debtors is directed to submit an appropriate order in accordance with Bankr.R.P. 9021.

---

22. For a case reaching the same result when applying similar factors, *see In re Witkowski*, 37 B.R. 352 (Bkrtcy.D.N.D.1984) (involved a nursery-grower, concrete pit, and a no-purchase option agreement).

23. Goods include "all things which are movable at the time the security interest attaches or are fixtures...." S.D.C.L. § 57A–9–105.

24. Section 57A–9–402(1) provides that:
A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address and either the social security number or the internal revenue service taxpayer identification number of the debtor and contains a statement indicating the types, or describing the items, of collateral.

25. Under U.C.C. Section 9–401(1), whether the buildings and concrete pit are either equipment used in farming operations or fixtures is of no consequence. This is because, in both circumstances, a Beadle County, South Dakota, recorder's office filing is required. U.C.C. Section 9–401(1), in pertinent part, reads as follows:
(1) The proper place to file in order to perfect a security interest is as follows:
(a) When the collateral is equipment used in farming operations or consumer goods, is in the office of the register of deeds in the county of the debtor's residence or if the debtor is not a resident of this state then in the office of the register of deeds in the county where the goods are kept;
(b) When the collateral is timber to be cut or is minerals or the like (including oil and gas) or accounts subject to subsection (5) of § 57A–9–103, or when the financing statement is filed as a fixture filing (§ 57A–9–313) and the collateral is goods which are or are to become fixtures, then in the office where a mortage on the real estate concerned would be filed or recorded.

26. Under Section 57A–9–403, a filed financing statement is effective for a period of five years from the date of filing.