**In re MARINER COMMUNICATIONS, INC. d/b/a WMRE Radio, Debtor.**

**Bankruptcy No. 86–10569–HL.**

United States Bankruptcy Court, D. Massachusetts.

April 16, 1987.

Jeffrey Baker, Gargill, Sassoon & Rudolph, Boston, Mass., for trustee.

Richard M. Passalacqua, Jonathan M. Feigenbaum, Pearlstein & Passalacqua, Boston, Mass., for Lockwood.

Whitton G. Norris, Linda Young, Peabody & Brown, Boston, Mass., for Creditors' Committee.

Richard G. McKenzie, Kahn & McKenzie, Boston, Mass., for Reservoir.

## MEMORANDUM ON STATUS OF LEASE/SECURITY AGREEMENT

HAROLD LAVIEN, Bankruptcy Judge.

The matter before the Court was prompted by a Motion to Compel Debtor to Accept or Reject an Executory Contract filed by Reservoir Leasing Corporation regarding the telephone system allegedly leased to the debtor. The trustee, in response to the motion, denied the validity of a lease, claiming that the equipment was properly vested in the debtor, and that any claim of Reservoir Leasing ("Reservoir") should be equitably subordinated under 11 U.S.C. § 510(c)(1). The Creditor's Committee claims that the so-called lease is actually a security agreement, and since appropriate filings have not been made, Reservoir holds a mere unsecured interest in the equipment. An evidentiary hearing took place, at which the testimony was extremely contradictory even on such basic items as when the alleged lease was prepared and signed. Much of the testimony strained credibility.

The ownership of the telephone system used by the debtor, brings before the Court a rather unusual set of facts and relationships. Mr. Robert Lockwood was appointed president of Mariner Communications in late December of 1984 by the company's shareholders, when the company was in poor financial condition. At that time, the company was $8,000 behind in payments on the telephone system it leased from AT & T. Mr. Lockwood testified that the system cost the company $1,500 per month and that the company was without sufficient funds to clear the arrearage. The telephone company was threatening to repossess the equipment. In any event, he thought the system inappropriate for the company's needs. Another satisfactory telephone system was found which could be purchased from Bay State Telephone during July of 1985 at a cost of $12,000. The

debtor originally intended to finance the acquisition of the phone system through a loan from an arm of Bay State Telephone. Arrangements for financing fell through at the last minute due to the debtor's receivership status. The AT & T system was soon to be repossessed. As a last ditch effort to acquire the phone system, Mr. Lockwood claims to have contacted Mr. Andrews, general partner of Reservoir, requesting assistance to the debtor in acquiring the phone system. Reservoir paid the $12,000 to Bay State and the phone system was delivered to the debtor. Those may be the only two facts not in dispute.

There is a close relationship between Robert Lockwood and the two Reservoir entities, Reservoir Management Corporation and Reservoir Leasing. Reservoir Management has Charles Andrews as director and president, and Susan Winslow as director and shareholder. Mr. Andrews is the general partner of Reservoir Leasing and Ms. Winslow, one of its limited partners. The other limited partners are Mrs. Mary Lockwood and Dr. Thomas Healy, respectively, wife and father-in-law to Robert Lockwood. Susan Winslow testified that she was not aware that Dr. Healy was Robert Lockwood's father-in-law. It appeared from testimony that Reservoir Leasing had lease arrangements with businesses other than the debtor, although no questions were asked by either counsel which would have firmly established the extent or the identities and specific arrangements with such entities. Susan Winslow testified that she had purchased her 25% limited partnership holding for $250—$500. Robert Lockwood's home address was indicated on Reservoir Leasing's 1985 tax form as the location of its operations. Mr. Lockwood matter of factly explained this as resulting from his wife's limited partnership holding. Mr. Lockwood insisted that he was not involved in ownership or management of Reservoir, although he signed checks on Reservoir Management's account which, he explained, was part of a loan arrangement. Carol Livingston, Lockwood's assistant, employed by one of his admittedly own corporations, was authorized to endorse his name to Reservoir Management's checks. Apparently, Ms. Livingston did some work for Reservoir as part of her employment with Lockwood.

This peculiar overlapping of interest between Mr. Lockwood and the Reservoir entities seems to hold true up to and including the present court hearings. For example, Mr. Lockwood's attorney sat at counsel's table with Reservoir Leasing's counsel who, incidentally, had previously represented Mr. Lockwood in other bankruptcies before this Court. During the cross-examination of Mr. Lockwood, Reservoir's attorney objected to a question and, in an apparent Freudian slip, stated that he represented Mr. Lockwood. Also, all briefs submitted by Reservoir on this matter have been prepared by Mr. Lockwood's counsel.

Putting these peculiarities to one side, Reservoir Leasing existed as a legitimate business entity. Its tax returns were entered into evidence for 1985 which list the payments by the debtor as due under the lease. A document entitled "lease" was submitted into evidence covering the telephone equipment in question which was apparently signed and dated on the appropriate date in July of 1985. Also, in evidence is a check from Reservoir Leasing to Bay State Telephone Systems in the amount of $12,000. Reservoir Leasing's ledger was submitted into evidence, as were the debtor's books, showing that the spasmodic payments from the debtor for the telephone equipment were labeled as lease payments. Ms. Livingston testified that she wrote the checks from the debtor and made entries in both the debtor's and Reservoir's books and that she worked on the lease, but not when it was dated, but just prior to the filing. Like everyone else in this case, Ms. Livingston's career is peculiarly interwoven, for she not only worked for Lockwood and Reservoir and the debtor, she now works for the trustee's counsel.

Aside from the alleged lease, the only other indication of title is the Bay State invoice which lists the property as sold to the debtor to whom it was delivered. There was no mention of Reservoir. The only document introduced between Bay

State and Reservoir was the check. No one from Bay State testified.

The trustee and the Creditor's Committee, under different theories and separate briefs, object to Reservoir Leasing's right to repayment for rents claimed, and title to and right to possession of the property. The arguments posed by counsel to the trustee are: (1) title to the phone equipment has always been vested in the debtor; (2) the purported lease was created sometime during the summer of 1986 and back dated; (3) and, finally, even if the Court finds a lease, the claim of Reservoir should be equitably subordinated to that of unsecured creditors under 11 U.S.C. § 510(c)(1). Creditor's Committee contends that the purported lease is, in substance, a security agreement and, as a result, the phone equipment is property of the debtor.

Since the Court rests its decision on title in the debtor and the alleged lease document being, at best, an unrecorded security agreement, the Court need not consider whether the lease was back dated or equitable subordination, but would simply point out as to subordination that the alleged lease was not an arm's length transaction. If this transaction is treated as a lease from Reservoir, its terms become unreasonable, approaching usury. Under the terms of the lease Reservoir receives a return of its $12,000 investment, plus a handsome interest, in addition to the return of the equipment at the end of the lease term, then worth approximately $4,000. On the other hand, if the debtor, after completing its payments, retained the equipment, it would have paid substantial interest but it would have obtained a better service than it had previously from AT & T at a smaller monthly payment at a time when its cash flow prevented a real arm's length bargain.

The Court is required to determine the true nature of the document entered into by the debtor and Reservoir, concerning the phone equipment. The Creditor's Committee has submitted a brief in which it argues that the document entitled "Lease" is in substance a security agreement. The Court will look beyond the characterization chosen by the parties and their conflicting testimony in order to discern the objective intent as ascertainable from the U.C.C., the instrument and the reasonable intent of the parties under all of the circumstances.

This matter is controlled by two provisions of the Uniform Commercial Code as adopted in Massachusetts. The definition of a security agreement is contained in M.G.L. c. 106 § 1–201(37):

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

The second relevant provision is contained in M.G.L. c. 106 § 9–102(1)(a), and addresses the scope of Article 9.

> § 9–102. Policy and Scope of Article. (1) Except as otherwise provided in section 9–103 on multiple state transactions and in section 9–104 on excluded transactions, this Article applies so far as concerns any personal property and fixtures within the jurisdiction of this state.
>
> (a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights;

If the Court finds a security agreement as opposed to a lease, Reservoir would forfeit all equity interest in the phone equipment as a result of its failure to file appropriate U.C.C. financial statements.

Reservoir urges the Court to characterize the instrument in question as a lease, heavily relying on the absence of an option to purchase clause in the document. As stated in M.G.L. c. 106 § 1–201(37), the presence of an option to purchase does not in and of itself render the document a security agreement, although an option coupled with a nominal purchase price is

satisfactory evidence of a security agreement. Generally, courts have given the presence of an option to purchase clause great weight in finding a security agreement. However, the absence of such an option will certainly not bar the Court from finding a security agreement. *In re Sprecher Bros. Livestock & Grain, Ltd.,* 58 B.R. 408 (Bankr.D.S.D.1986); *In re Cook,* 52 B.R. 558 (Bankr.D.N.D.1985); *In re Tillery,* 571 F.2d 1361 (5th Cir.1978). As noted by the courts in *In re Gehrke Enterprises, Inc.,* 1 B.R. 647, 28 U.C.C. 794, 800 (Bankr.W.D.Wis.1979); *In re Catamount Dyers, Inc.,* 43 B.R. 564, 569 (Bankr.D.Vt.1984), the parties to these agreements have become increasingly sophisticated, and, as a result, it is too simple a test to hold the presence on absence of an option as definitive in characterizing an instrument as a lease or security agreement.

The court is mindful of the 16 part test implemented by the court in *In re Brookside Drug Store, Inc.,* 3 B.R. 120 (Bankr.D.Conn.1980) in order to aid in its determination:

(1) whether there was an option to purchase for a nominal sum, (2) whether there was a provision in the lease granting the lessee an equity or property interest in the equipment, (3) whether the nature of the lessor's business was to act as a financing agency, (4) whether the lessee paid a sales tax incident to acquisition of the equipment, (5) whether the lessee paid all other taxes incident to ownership of the equipment, (6) whether the lessee was responsible for comprehensive insurance on the equipment, (7) whether the lessee was required to pay any and all license fees for operation of the equipment, and to maintain the equipment at his expense, (8) whether the agreement placed the entire risk of loss upon the lessee, (9) whether the agreement included a clause permitting the lessor to accelerate the payment of rent upon default of the lessee and granted remedies similar to those of a mortgagee, (10) whether the equipment subject to the agreement was selected by the lessee and purchased by the lessor

for this specific lessee, (11) whether the lessee was required to pay a substantial security deposit in order to obtain the equipment, (12) whether the agreement required the lessee to join the lessor, or permit the lessor by himself, to execute a UCC financing statement, (13) whether there was a default provision in the lease inordinately favorable to the lessor, (14) whether there was a provision in the lease for liquidated damages, (15) whether there was a provision disclaiming warranties of fitness and/or merchantability on the part of the lessor [and], (16) whether the aggregate rentals approximate the value or purchase price of the equipment.

Other courts have adopted this analysis. *See, In re Cook, Supra; In re Catamount Dyers, Inc.,* 43 B.R. 564 (Bankr.D.Vt.1984). The instrument between the debtor and Reservoir includes many of the clauses noted in *Brookside* as indicating a security agreement. The Creditor's Committee included such a list in its brief:

2(A)—Disclaimers of all warranties by Lessor.

2(B)—Lessee obligated to pay rent even though equipment does not operate correctly. Lessee's only claim is against the Seller.

2(C)—Lessee specifically requested that Lessor order this particular equipment.

4(B)—First payment of rent is three times the normal rent, with extra being reserved as a security interest (refundable at option of Lessor).

4(E)—Rent may be based on estimates of the cost of equipment to Lessor with adjustments to be paid in full at the end of the term.

8(D)—Lessee solely responsible for repair and maintenance.

8(E)—Lessee responsible for replacement of parts.

9(A)—Lessee bears risk of loss or damage to Lessee, customers or anyone else.

10(A)—Lessee bears risk of loss and destruction of equipment.

10(B)—Lessee indemnifies Lessor for all cost and expenses relating to lease.

10(C)—If there is destruction or permanent damage to equipment, Lessee must pay unpaid rent, lease term terminates and *title and interest to the equipment and insurance proceeds become property of Lessee.* (emphasis added)

11—Lessee obligated to insure at the actual cash value of the equipment.

12—Lessee obligated to pay all fees, taxes and other charges.

15(B)—On default by Lessee, Lessor may accelerate the balance due and terminate the lease.

15(C)—If Lessor sells the equipment, Lessee obligated to pay deficiency between net sales proceeds of sale and the unpaid rent for the balance of term.

15(E)—Provision for Liquidated Damages.

17—Agreement to cooperate in the filing of Financial Statements.

All but two of the noted clauses, 2(C) and 17, shift risk from Reservoir to the debtor.

In determining whether the so-called lease masks an equity shift, the court favors a broad analysis, considering the totality of the instrument as in *Brookside* within the context of the parties' intent. However, the court is left in a difficult position in this regard because, as already stated, it gives minimum credibility to the testimony of any of the witnesses. In making its findings, it calls upon its understanding of the likely conduct of the parties under the circumstances in determining which of the possibilities best comport with common sense.

█ Lockwood's denial of his connection with Reservoir seems patently false and I am satisfied that he played a major role in Reservoir's activities. Clearly, he is a sophisticated and experienced businessman. He testified that Mariner was in desperate financial straits. There had been a state court receiver. Supposedly, Bay State could not arrange credit through its own channels to finance the telephone purchase. AT & T was about to repossess its equipment for non-payment. As something of a last resort, he turned to Reservoir for funding. While such circumstance certainly would support a higher rate of return, it does not fully support a return approaching the exorbitant.

Against this background are the dual hats worn by Lockwood. It is impossible to imagine that the negotiations between the debtor, as represented by Lockwood, were arms length. As a matter of fact, his personal interest in creating a profit for his wife and father-in-law directly conflicted with the debtor's interest. Moreover, Reservoir has consistently lent money to the debtor.

Lockwood's dual posture, combined with the numerous clauses in the so-called lease, shifts risk from Reservoir to the debtor. Of particular concern to this Court, as it was in *In re Beker Industries Corp.,* 69 B.R. 937 (Bankr.S.D.N.Y.1987), and *Brookside, supra,* is that the rentals over the three-year lease term provides Reservoir with a return of the $12,000 purchase price, and then a $5,460 profit. The lease in *Beker,* unlike the one before the Court, included an option to purchase. However, the relationships between the parties in *Beker,* only involved the one transaction, and not the multiple roles at play in this matter.

Another important factor are the clauses under which the debtor is obligated to pay all unpaid amounts, whether or not the equipment is operating correctly, destroyed or permanently damaged, and/or the debtor's default. The court in *In re Catamount Dyers, Inc.,* 43 B.R. 564, 569 (Bankr.D.Vt.1984) found a sale when the debtor was obliged, under all circumstances, to pay the full lease price. Reservoir is promised a substantial monetary return which, if the equipment is returnable, would be far in excess of the value of the equipment. The court in *Catamount* also noted that the lessor had only provided "format paper facts" failing to prove a sale. The court suggested that the lessor could have proven a lease by documentation of such identification plates on the machines, or any course of business doc-

uments other than the lease indicating the so-called lessor as owner.

Reservoir, under its arrangement with Mariner, was to receive the agreed return on its investment, plus any tax benefits, and also was entitled to the possession of the phone equipment at the end of three years. Witnesses for both sides testified that Lockwood, on behalf of the debtor, had an open line of credit from Reservoir, and checkwriting authority. Reservoir had lent money, not always secured, to the debtor before and after the phone equipment was purchased. The Court is convinced that the phone equipment purchase was funded with one of the many loans from Reservoir to the debtor and that the lease is, in substance, a security agreement.