In the Matter of BROOKSIDE DRUG STORE, INCORPORATED, Debtor.

K. L. C., INC., Plaintiff,

v.

BROOKSIDE DRUG STORE, INCORPORATED, Debtor, Defendant.

Bankruptcy No. H–79–796.

United States Bankruptcy Court, D. Connecticut.

Feb. 28, 1980.

John J. O'Neil, Jr., Hartford, Conn., for plaintiff.

David Brown, Meriden, Conn., for defendant.

## MEMORANDUM AND ORDER

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

### FACTS

K.L.C., Inc., doing business as Keystone Leasing of Connecticut ("Keystone"), brought a complaint to reclaim two electronic cash registers from Brookside Drug Store, Inc. ("Brookside"), the debtor in possession in this Chapter XI proceeding. The complaint alleged (1) the existence of a lease agreement between Keystone, as lessor, and Brookside, as lessee; (2) that rental payments were in default; and (3) that Keystone was entitled to possession. Brookside filed an answer, denying that the document under which it received the registers is a true lease, claiming rather that it was a security agreement requiring the filing of a financing statement to perfect a security interest. The answer then averred that since there had been no such perfection, the interest of Keystone was subordi-

nate to the rights of the debtor in possession.[1]

At the trial, the following background to the lease transaction was elicited. Brookside was originally contacted by a representative of E.C.R. Systems ("ECR") concerning the sale of two cash registers by it to Brookside. The ECR salesman told Brookside that if Brookside did not wish to pay the cash price of $1,453.80, it could obtain the registers through a lease agreement with Keystone. The lease would provide for monthly payments for one year of $149.93 plus $10.08 tax. According to the corporate officer of Brookside who approved the lease agreement, he was also told by the ECR salesman that the registers could be purchased at the end of the lease for a nominal sum of money, such as ten dollars. The president of Keystone testified that Keystone is a leasing company which normally obtains its customers through vendors such as ECR, and that what happened with Brookside is typical of the way Keystone operates. When Brookside decided to choose the lease route to obtain the cash registers, ECR furnished a Keystone lease application to Brookside which, when completed, was sent to Keystone. This lease application listed ECR as the vendor, Brookside as the applicant, and a bank reference of Brookside. The application also listed the *cost* of equipment to Keystone and the number of months the lease was to run. Keystone, having approved the application, sent its lease form to Brookside for execution. Only after the lease was signed by Brookside and received by Keystone, did Keystone then purchase the cash registers from ECR for the same price offered to Brookside. Both the invoice from ECR to Keystone for the cash registers and the lease agreement are dated July 17, 1978.

The president of Keystone denied that the lease agreement was intended to be a security agreement. He stated that Keystone took the depreciation on the equipment, that the useful life of the equipment, in his opinion, exceeded the one-year term of the lease, and that there was no written or oral agreement that Brookside would be able to purchase the equipment from Keystone at the end of the lease term for a nominal amount. He stated that the ECR salesman was not an employee of Keystone and that Keystone did not consider itself bound by anything that such a person may have told Brookside. The president admitted that no one from the leasing company ever saw or spoke with Brookside. All dealings of Brookside for the registers were with the ECR salesman who carried with him the lease application forms provided by Keystone.

## CONCLUSIONS

The issue, then, presented in this case— whether an instrument constitutes a true lease, or, although couched in the terminology of a lease, gives rise to a mere security interest is "one of the most frequently litigated issues under the entire Uniform Commercial Code". White and Summers, *Handbook of the Law Under the Uniform Commercial Code*, § 22–3 at 760 (1972). Transactions that foster this frequent litigation arise out of a peculiarly American commercial institution, the equipment lease. Businesses employ the equipment lease as a means to obtain the use of needed equipment without making capital outlays. This device has, to some extent, created a service industry, the purpose of which is to finance the purchase and leasing of such equipment. Peden, *The Treatment of Equipment Leases as Security Agreements Under the Uniform Commercial Code*, 13 Wm. & Mary L.Rev. 110 (1971) *passim*. The problems created by the "lease or security interest" issue are recognized in two sections of the Uniform Commercial Code ("UCC"). Section 9–102(1)(a) of the Code (Conn.Gen.Stats. § 42a–9–102(1)(a)) provides that UCC Article 9 applies "to any transaction, regardless of its form, which is intended to create a security interest in personal property . . . ." Further explication of this rule is found in paragraph 1 of the Official Comment appearing under § 9–102 which

1. Sec. 70 of the Bankruptcy Act.

states that "the principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security?", and, further: "When it is found that a security interest as defined in Section 1–201(37) was intended, this Article applies *regardless of the form of the transaction or the name by which the parties may have christened it.*" (Emphasis supplied.)

Determination of whether or not a lease is intended as security must be in accordance with the terms of the definition of a security interest found in UCC § 1–201(37) (Conn.Gen.Stats. 42a–1–201(37)), which reads in pertinent part:

> Whether a lease is intended as security is to be determined by the facts of each case; however (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease, the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

When the UCC was initially enacted, it thus appeared that the operative test in determining the intent of an instrument with respect to the lease-security interest issue would be whether the instrument included an agreement that the lessee had the option to purchase the property for a nominal consideration. As litigation under the UCC materialized, however, it became apparent that omission of an option to purchase for a nominal consideration would not automatically save a lease instrument from being held a disguised security agreement. A common theme in these cases is the establishment of certain indicia to which the courts have looked to determine whether a true lease existed or whether the agreement was one for a security interest.[2] In general, the cases point out that while the intent of the parties is controlling, that intent has to be gleaned circumstantially from the contents of the document as well as from the factual settings of the transaction. *Lease Finance, Inc. v. Burger, supra,* at 1312. As noted in *Granite Equipment Leasing Corporation v. Acme Pump Company, Inc.,* 165 Conn. 364, 368, 335 A.2d 294, 296 (1973): "To distinguish a true lease from a security agreement in the guise of a lease by the ascertainment of the parties' intent, as required by the Uniform Commercial Code, is often a difficult matter". In *Tishman Equipment Leasing, Inc. v. Levin,* 152 Conn. 23, 202 A.2d 504 (1964), the court held that "[i]n the determination of the actual intent and purpose of the transaction, the negotiations surrounding it may properly be considered and its real nature is a question of fact to be resolved by the trier". Each of the decisions cited in note 2 *supra* relied upon a combination of some of the following factors to determine that the lease agreement provided for a hidden security interest: (1) whether there was an option to purchase for a nominal sum, (2) whether there was a provision in the lease granting the lessee an equity or property interest in the equipment, (3) whether the nature of the lessor's business was to act as a financing agency, (4) whether the lessee paid a sales tax incident to acquisition of the equipment, (5) whether the lessee paid all other taxes incident to ownership of the equipment, (6) whether the lessee was responsible for comprehensive insurance on the equipment, (7) whether the lessee was

**2.** *In re Transcontinental Industries, Inc.,* 3 UCC Rep.Serv. 235 (ND Ga.1965); *In re Royer's Bakery, Inc.,* 1 UCC Rep.Serv. 342 (ED Pa. 1963); *In re Brothers Coach Corp.,* 9 UCC Rep.Serv. 502 (ED N.Y.1971); *In re Telemax Corp.,* 10 UCC Rep.Serv. 1316 (SD N.Y.1971); *Uniroyal, Inc. v. Michigan Bank N. A.,* 12 UCC Rep.Serv. 745 (Mich.Cir.Ct.1972); *In re First Baptist Church of Margate, Fla.,* 17 UCC Rep. Serv. 1098 (SD Fla.1975); *Leasing Service Corp. v. American National Bank & Trust Co.,* 19 UCC Rep.Serv. 252 (D N.J.1976); *Bell v. Itek Leasing Corp.,* 22 UCC Rep.Serv. 774 (Ark. 1977); *In re Tillery,* 2 BCD 455 (SD Ala.1976); *Lease Finance, Inc. v. Burger,* 23 UCC Rep. Serv. 1309 (Colo.App.Ct.1977); *In re Joe Necessary & Son, Inc.,* 475 F.Supp. 610 (WD Va. 1979); *All States Leasing Co. v. Ochs,* 27 UCC Rep.Serv. 808 (Or.A.Ct.1979). Of these cases, *Telemax Corp., Transcontinental Industries, Leasing Service Corp.,* and *Tillery* all involved instruments including no option to purchase.

required to pay any and all license fees for operation of the equipment, and to maintain the equipment at his expense, (8) whether the agreement placed the entire risk of loss upon the lessee, (9) whether the agreement included a clause permitting the lessor to accelerate the payment of rent upon default of the lessee and granted remedies similar to those of a mortgagee, (10) whether the equipment subject to the agreement was selected by the lessee and purchased by the lessor for this specific lessee, (11) whether the lessee was required to pay a substantial security deposit in order to obtain the equipment, (12) whether the agreement required the lessee to join the lessor, or permit the lessor by himself, to execute a UCC financing statement, (13) whether there was a default provision in the lease inordinately favorable to the lessor, (14) whether there was a provision in the lease for liquidated damages, (15) whether there was a provision disclaiming warranties of fitness and/or merchantability on the part of the lessor, (16) whether the aggregate rentals approximate the value or purchase price of the equipment. The decisions, while following the injunction of UCC § 1–201(37) to render a determination on the facts of each case, have paid particular attention to what agreement does rather than what it formally says it is. *In re Brothers Coach Corp., supra.*

■ In the case before the court, the disputed instrument clearly reserves title in Keystone and no option to purchase the equipment for a nominal sum appears anywhere in the lease agreement. On the other hand, the following covenants are contained in the lease which provide that: (1) the lessee keep comprehensive insurance in force on the property (paragraph 8); (2) the lessee bear the loss of the property and pay installments regardless of theft or destruction of the property (paragraph 8); (3) the lessee maintain the property in good repair at his expense (paragraph 11); (4) the lessee

pay taxes and assessments, and license and registration fees in connection with the property (paragraph 12); (5) the lessor disclaims all warranties of fitness and suitability (paragraph 10); (6) in the event of default, all remaining unpaid rent installments may become due and payable and lessee's right to possession terminates (paragraph 13); (7) the lessor is authorized to file a UCC financing statement (paragraph 15). It is apparent that these are all indicia of a transaction for security purposes according to decisional law. Where there is no option to purchase, a factor of special significance is whether the lease in some other way creates in the lessee an equity or pecuniary interest. *In re Royer's Bakery, Inc., supra,* at 345–346; *Lease Finance Corp. v. Burger, supra,* at 1312; and *In re Tillery, supra,* at 457, 458. Such a provision may be found in the lease before the Court. Paragraph 13 of the lease provides for repossession by the lessor in the event of default. Subparagraph A explicates some of the rights of the parties on repossession:

> Upon such repossession of the Leased Property, the Lessor shall have the right to:
>
> A. Rerent the Leased Property and credit the rentals collected thereunder during the balance of the term of this Lease upon the unpaid balance of the rents hereunder after first deducting the costs and expenses of repossession . . . storage until rerenting, reconditioning and repair of the Leased Property and rerenting, *paying any overplus to the Lessee, the Lessee to remain liable for any deficiency,* or . . . (emphasis supplied).

Whatever other legal effect subparagraph A may have, it grants Brookside a pecuniary interest in any "overplus" of rental payments recovered by Keystone upon repossession and rerental of the cash registers.[3]

---

**3.** This factor alone distinguishes the instant case from *In re Lockwood Industrial Leasing Corp. v. Sabetta,* 16 UCC Rep.Serv. 195 (D.Conn.1974). That case is also distinguisha-

ble in that therein "no evidence was presented as to the negotiations of the parties or as to any oral arrangements which would vary the expressed content of the lease agreement . . .".

The evidence adduced at the trial demonstrates that the transaction between Keystone and Brookside was a transaction for financing Brookside's acquisition of equipment. It was admitted that the two cash registers were purchased specifically for Brookside and selected by Brookside. Keystone is in the business of financing equipment purchases and does not maintain an inventory of equipment that it leases. There was no arm's-length bargain between the parties to the agreement; the seller of the cash registers supplied Brookside with the Keystone agreement form. One may infer from the differential between the price paid by Keystone for the cash registers, $1,453.80, and the total rent required from Brookside, $1,789.16, plus tax, that the additional amount represents a not unreasonable interest payment. Considering the covenants contained in this lease and the circumstances surrounding its execution, the Court holds that the intent of that instrument was to provide Keystone a security interest in the two cash registers. It is the primary purpose of Article 9 of the Uniform Commercial Code to establish a single category, the Article 9 security interest, to cover the many types of financing arrangements with which the pre-Code Law was burdened. Incident to its establishment of such a category, Article 9 provides for the perfection of such security interests by a simple recordation requirement. Financing agencies may, from time to time, seek to avoid the trouble and expense of recording their security interests. To permit them so to do is contrary to the policy embodied in the requirement—that third parties dealing with personal property and security interests therein should have notice of prior interests. *Uniroyal, Inc. v. Michigan Bank, supra,* at 750. Keystone could have filed a financing statement under the UCC with respect to this transaction. It reserved the right to do so under paragraph 15 of the lease. That Keystone failed to record its security interest means that that

interest is unperfected as to the debtor in possession, and Keystone's complaint to reclaim the cash registers is denied. This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Rule 752 of the Rules of Bankruptcy Procedure. It is

SO ORDERED.

---

*Id.* at 200. A further element in the *Lockwood* case not present before us is the fact that there a financing statement *was* filed, and the court found that "even if the lease had been shown to

be one intended for security . . . the security interest was perfected by the filing of a sufficient financing statement." Id. at 203.