**In re ACCESS EQUIPMENT, INC., Debtor.**

**Bankruptcy No. 86–10309–JG.**

United States Bankruptcy Court, D. Massachusetts.

July 9, 1986.

John A. Houlihan, Providence, R.I., for debtor.

Thomas P. Billings, Boston, Mass., for Access Satellite Intern. (USA), Inc.

## MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

This matter is before the Court upon the motion of Access Satellite International (USA), Inc. ("Satellite") for relief from stay. Satellite seeks to recover eleven elevating work platforms and 253 associated mast sections from Access Equipment, Inc. ("Equipment" or the "debtor").

This bankruptcy proceeding was commenced on March 13, 1986 by Equipment's filing of a voluntary petition under Chapter 11 of the Bankruptcy Code. Prior to that date, Equipment was embroiled in litigation with Satellite and Access Exports, Ltd. ("Exports") in the Middlesex Superior Court. Satellite had filed suit against Equipment on February 22, 1986 for recov-

ery of its equipment and money damages, and Exports had joined the suit to recover possession of nine elevating work platforms and forty mast sections, as well as money damages. One half-hour before trial was to begin in the Superior Court, Equipment filed its petition, thereby staying the Superior Court action.

Satellite and Exports immediately filed a motion for relief from stay, seeking *inter alia* to proceed with the state court action. On March 14, 1986, this court denied the motion for relief from stay insofar as it sought to allow the Superior Court trial to proceed, but scheduled evidentiary hearings on other aspects of the motion.

On April 1, May 14, and May 15, 1986, the parties presented oral testimony. At the close of trial on May 15, Equipment conceded Exports proprietary interest in nine work platforms and forty mast sections. Therefore, the sole question before the Court is whether Equipment or Satellite owns the eleven work platforms and associated mast sections remaining in Equipments' fleet. The answer to that question turns on whether the transactions pursuant to which Equipment obtained the machines were true leases, as Satellite contends, or financing arrangements, as the debtor contends.

Satellite manufactures ancillary equipment for the elevating work platforms for use in this country. It sells these platforms and ancillary equipment to distributors and direct customers in areas not covered by distributorship agreements, and it rents, services and repairs work platforms as well.

The basic unit, consisting of a forty-foot wide platform, a road towable chassis, and four mast sections, retails for $161,276; additional mast sections are $1,045 apiece. Satellite sells the elevating work platforms to its distributors at a substantial discount, however. In March of 1985, for example, there existed a special concessionary price of $35,697 as well as a regular distributors' price of $44,621 per platform.

Satellite initially awarded the New England distributorship for work platforms to Exports, an English limited company with no shareholding relationship to Satellite or its affiliates. Exports purchased nine work platforms and forty mast sections from Satellite, and its managing director, Julian C.H. Dunlop ("Dunlop") moved to the United States in the summer of 1984 to administer the business of renting the machines to construction firms in New England.

In early February of 1985, at a directors' meeting of Exports, Dunlop informed his fellow directors that he had formed a Massachusetts corporation called Access Equipment, Inc., the debtor herein. Ostensibly, the reasons for the formation of the new company were that it was preferable to do business in the United States through an American company and that Exports' name was misleading since, in fact, it was not in the export business and did not export anything. Various relationships between Exports and Equipment were discussed, including a parent-subsidiary relationship, but no final determination regarding a shareholding arrangement between the two companies was made by the directors at that time.

Nevertheless, in a letter dated February 19, 1986, Dunlop, as managing director of Exports, requested Satellite to make necessary adjustments to its files to effectuate the transfer of the New England distributorship from Exports to Equipment. Satellite did not act on Dunlop's request until May 11, 1986, however, when, through its Assistant Secretary and Operations Manager, Richard L. Whitacre, it wrote "[w]e are in the process of changing our records to now indicate the distributorship for New England United States to be Access Equipment, Inc. and in so doing approve this amendment to the original agreements with Access Exports, Ltd." As a consequence of its acceptance of the transfer, which acceptance was predicated on the erroneous assumption that Equipment was a subsidiary of Exports, the contents of Satellite's file for the distributorship, including a distributorship agreement, a purported Equipment Rental Agreement and all the debt were changed to reflect Equip-

ment's new status. Furthermore, two work platforms and 176 mast sections which Exports had rented from Satellite since November 1984 became the responsibility of Equipment. In connection with that transaction, Satellite had sent to Exports, care of Dunlop, an "Equipment Rental Agreement" for signature which had neither been signed nor disavowed by Dunlop. Representatives of Satellite, therefore, assumed its terms controlled the relationship between Satellite and Exports and later between Satellite and Equipment.

In the ordinary course of Satellite's business, the Equipment Rental Agreement served as a master lease. The master lease was supplemented by separate Equipment Rental Applications which explicitly reference the Equipment Rental Agreement and set forth the rental term and price. In renting work platforms to its customers, Equipment used an identical form.

On May 7, 1985, Dunlop wrote to Whitacre enclosing three Equipment Rental Applications covering eight machines, including the two machines previously rented by Exports. Each application provided that the annual rent would be $10,000 per platform and $360 per mast section. An Equipment Rental Application for three additional work platforms, transmitted on May 22, 1985, contained identical terms. Three of the four applications additionally provided that fifty per cent of the rent paid could be credited against the purchase price of the machines.

The price, option and duration terms appearing on the Equipment Rental Applications actually had been agreed to on March 16, 1985 at a meeting at which representatives of Satellite, Exports, and Equipment were present. Additionally, the parties agreed at that meeting to review the purchase price of the machines "from the current $35,697 to the distributors [sic] price of $44,621, similarly with mast sections." Thus, it is apparent from the Equipment Rental Applications that the $35,697 price was raised to $36,000.

At or around the time of the March 16th meeting, Dunlop and A. Geoffrey Raine ("Raine"), Satellite's President, discussed the sale of ten platforms by Satellite to Equipment. Raine testified that Equipment agreed to buy the platforms, if it could obtain the necessary outside financing to purchase them. To accommodate Equipment, Satellite, by letter dated April 30, 1986, offered to extend its normal payment terms for three to six months. On that same date, Satellite invoiced Equipment for $360,000, the purchase price for ten machines and, thereafter, carried that amount on its books for a time as an account receivable. However, Satellite continued to bill Equipment for rental fees for the use of the equipment. Equipment never paid Satellite any amount toward the purchase price, although it did make several rental payments. When it became clear that Equipment was not going to be able to obtain the requisite financing, despite Satellite's offer to assist Equipment in obtaining it, Satellite issued a credit memorandum to Equipment for $360,000 purchase price and reversed the sale on its books. Significantly, the credit memorandum was issued on November 6, 1985, approximately 180 days after Satellite's offer to extend its payment terms for that amount of time.

Approximately three and one half months later, on February 21, 1986, John W. Garton, one of Satellite's directors wrote to Equipment to terminate the lease agreements between Satellite and Equipment on grounds of nonpayment, insolvency and misrepresentation of its relationship with Exports. The next day Satellite, joined by Exports, commenced suit in the Middlesex Superior Court.

## CONCLUSIONS OF LAW [1]

The question of whether particular transactions in the form of leases are "true leases" or "leases intended for security" has spawned a considerable number of civil cases and is "one of the most hotly litigated topics in commercial [and bankruptcy]

1. The parties do not dispute the fact that North Carolina law governs this case.

law." *See American Standard Credit, Inc. v. National Cement Co.*, 643 F.2d 248, 261 (5th Cir.1981), and authorities cited therein. In determining whether a contract is a "true lease" or one intended for security, "courts 'do not consider what description the parties have given to it, but what is its essential character.'" *Szabo Food Service, Inc., of North Carolina v. Balentine's, Inc.*, 285 N.C. 452, 206 S.E.2d 242, 15 U.C.C.Rep. 170, 177 (1974); *accord In re Mohawk Industries, Inc.*, 49 B.R. 376, 378 (Bankr.D.Mass.1985) ("... [I]t is well settled that Massachusetts and the majority of other jurisdictions look to substance over form when deciding if a transaction is a lease or a conditional sale."); *In re Keydata Corp.*, 18 B.R. 907, 910 (Bankr. D.Mass.1982) ("[T]he court must look not only at the intentions of the parties but the facts and effects of their actions.").

Equipment argues that the economic realities of the transactions at issue show that the arrangement between Satellite and Equipment more closely resembles a financing arrangement than a true lease. Indeed, it posits that a *de facto* financing arrangement existed and that the arrangement by which fifty percent of the yearly rental payments (i.e., $5,000) could be deducted from the purchase price (i.e., $36,-000) allowed Equipment to obtain an equity interest in the machinery equal to approximately one half of its supposed rental payments, without requiring the immediate payment of the purchase price. According to Equipment, Satellite achieved its objective of selling the machinery by deferring payment of the purchase price to a balloon payment at the end of the lease term and accepting a combination of interest and principal in the form of supposed rental payments over the term of the purported lease agreement.

Equipment relies heavily on the terms of the Equipment Rental Agreement dated November 11, 1984 to support its position that Equipment obtained an equity interest, specifically, paragraph 1.(e),[2] and, in fact, purchased, not leased work platforms from Satellite. It emphasizes sections in the Equipment Rental Agreement relating to 1) Equipment's obligation to provide comprehensive insurance in favor of Satellite; 2) Equipment's burden to pay taxes on the equipment; 3) Equipment's responsibility for maintaining the machines; 4) Satellite's ability to accelerate payments in the event of a default; 5) Satellite's disclaimer of all express and implied warranties; 6) the imposition of the risk of loss on Equipment; and 7) Equipment's obligation to hold Satellite harmless.

Satellite characterizes Equipment's argument as absurd. It emphasizes that the option exercise price, which was 86% of the price new, was far more than nominal and that Equipment consistently treated the transactions as leases. Furthermore, it dismisses the seven factors enunciated by Equipment as typical commercial lease drafting devices. Clearly, the facts and the law support Satellite's position. Indeed, the very cases cited by Equipment compel a decision for Satellite.

U.C.C. § 1–201(37) defines a security interest. Its aim is to prevent buyers and sellers from disguising secured installment sales as leases, thereby placing them beyond the reach of U.C.C. provisions governing secured transactions. According to the United States Court of Appeals for the Tenth Circuit, its language suggests a four-step approach to determine whether a purported lease is in reality a secured transaction. As succinctly stated by that court:

> ... [T]he presence of a purchase option does not automatically preclude a finding

**2.** That section provides:

*Lease Noncancellable; Payments to be Net.* Lessee agrees that all rental payments or other sums payable by Lessee hereunder shall be the unconditional obligation of Lessee and shall be made without abatement, reduction, or setoff of any nature, including any thereof [sic] arising out of any present or future claim the Lessee may have against the Lessor or any of its assignees or the manufacturer or vendor of the Equipment. This lease shall not be cancellable or terminable by Lessee prior to the end of the Term except as herein expressly provided.

of a true lease.... [I]f a purchase option exists and it or other terms in the 'lease' permit the 'lessee' to become full owner by merely paying no or nominal consideration after complying with its terms, ... [t]he lease is deemed a secured transaction as a matter of law and thus subject to the provisions of U.C.C. Article Nine *See, e.g., Percival Construction Co. v. Miller & Miller Auctioneers, Inc.,* 532 F.2d 166, 171–72 (10th Cir.1976), *aff'g* 387 F.Supp. 882 (W.D. Okl.1973); *Citicorp Leasing, Inc. v. Allied Institutional Distributors, Inc.,* 454 F.Supp. 511, 516 (W.D.Okl.1977); *Dynalectron Corp. v. Jack Richards Aircraft Co.* 337 F.Supp. 659, 661 (W.D.Okl. 1972).... [I]f the option does not require greater than nominal consideration for full ownership, a true lease is usually found. *See, e.g., Crest Investment Trust, Inc. v. Atlantic Mobile Corp.,* 252 Md. 286, 250 A.2d 246, 249 (1969) (option price over 50% of list price); *Xerox Corp. v. Smith,* 67 Misc.2d 752, 325 N.Y.S.2d 682, 682–83 (N.Y.Civ.Ct.1971) (option price 50% of list).

\*    \*    \*    \*    \*    \*

... [E]ven though nothing in the 'lease' may permit purchase at nominal consideration, the 'lease' will still be deemed one intended for security if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot. *See, e.g., In re Tulsa Port Warehouse Co.,* 29 U.C.C.Rep. Serv. 1608, 1612–13 (N.D.Okl.1980); *In re Brookside Drug Store, Inc.,* 3 B.R. 120, 29 U.C.C.Rep.Serv. 230, 234–36 (Bkrtcy.Conn.1980).

*Matter of Fashion Optical, Ltd.,* 653 F.2d 1385, 1388–89 (10th Cir.1981).

■ The most significant factor in distinguishing the conditional sale masquerading as a lease and a true lease is the relationship of the option price to the value of the goods at the end of the lease term. In the instant case, the Equipment Rental Agreement, which was not signed by the representatives of Satellite, Equipment or Exports, contains no option provision. However, by the March 16, 1985 agreement of the parties, Equipment was granted the option to purchase work platforms for $36,000, less one half the rental payments made, a price that cannot be considered nominal by any stretch of the imagination. As pointed out by Satellite and relied upon by a number of courts, "[I]f the option price amounts to 25% or more of the total list price, then the 'lease' is not one intended for security." J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code* 881 (2d ed. 1980) *citing In re Wheatland Electric Products Company,* 237 F.Supp. 820, 2 U.C.C.Rep. 486 (W.D.Pa.1964) and *In re Alpha Creamery,* 4 1:U.C.C.Rep. 794 (Bankr.W.D.Mich.1967). Commentators conclude that this rule of thumb is consistent with the "economic realities test." That test provides that if at the end of the lease term the only sensible course economically for the lessee would be for him to exercise his option the transaction is really a secured installment sale to which Article Nine applies. Accordingly, "if the option price amounts to 25% (or more) of the total list price, then it would appear that the lessee has been paying true rent rather than 'building up an equity,' and it would not follow that the only sensible course for him would be to exercise his option." J. White & R. Summers, *supra.* Given the fact that the option price was 86% of the purchase price, assuming a lease term of one year, it certainly cannot be said that the terms of the lease and option to purchase are such that the only sensible course for Equipment at the end of the lease term would be to exercise its option to become the owner of the goods.

Besides what the court considers to be the salient factor in determining whether a lease is a "true lease"—the relationship of the option price to the value of the equipment at the end of the lease terms—courts have considered a number of other factors, including those listed by Judge Krechevsky in *Matter of Brookside Drug Store, Inc.,* 3 B.R. 120 (Bankr.D.Conn.1980): 1) whether the lessee acquires equity in the property; 2) whether the lessor is a financing agency;

3) whether the lessee paid sales tax upon acquiring the equipment; 4) whether the lessee pays all taxes incident to ownership; 5) whether the lessee is responsible for comprehensive insurance; 6) whether the lessee is responsible for license fees and maintenance; 7) whether the lessee bears the risk of loss; 8) whether the lessor may accelerate payments upon default; 9) whether the equipment was preselected by the lessee and purchased by the lessor for the lease; 10) whether the lessee paid a security deposit; 11) whether the lessee permits or joins the lessor in filing a U.C.C. financing statements; 12) whether default provisions are inordinately favorable to the lessor; 13) whether the lease contains provisions for liquidated damages; 14) whether the lease disclaims warranties of fitness and for merchantability; and 15) whether the aggregate rentals approximate the value or purchase price of the equipment. *See In re Brookside Drug Store, Inc.*, 3 B.R. at 122–23; *see also In re Keydata Corporation*, 18 B.R. 907, 910 (Bankr.D.Mass.1982) and cases cited therein in which several of these factors also are enumerated.

■ Applying these factors, not all of which merit the same weight, to the instant case, it is apparent that although some of the terms of the November 1984 lease agreement are characteristic of leases intended for security the outcome of the application of the majority of the factors weighs in favor of a true lease. Additionally, it is important to recognize that Equipment's argument relative to its obtaining an equity interest in the equipment is spurious.

Case law makes it plain that equity does not mean simply that the lease is for a term and is noncancellable. On the contrary under a "lease" in which the "lessee" acquires an equity interest, "[t]he termination formula recognizes the equity of the 'Lessee' in the [leased property] because he is required to bear the loss or receive the gain from its wholesale disposition upon termination of the lease." *In re Tulsa Port Warehouse Co. Inc.*, 690 F.2d 809, 811 (10th Cir.1982), *quoting In re Tillery,*

571 F.2d 1361, 1365 (5th Cir.1978); *see also In re Brookside Drug Store, Inc.*, 3 B.R. at 123. For example, in *In re Tulsa Port Warehouse Co., Inc.*, the lease provided that at the end of the lease term the lessor would dispose of the vehicle at wholesale in a commercially reasonable manner. If the sale amount turned out to be less than an agreed depreciated value, the lessee would be liable to the lessor for the deficit.

In the instant case, neither the Equipment Rental Agreement nor the Equipment Rental Applications give Equipment such an equity interest since at the end of the lease term Satellite would either take the equipment back or agree to a new term. In the event of premature termination Satellite would take the equipment back and Equipment would remain liable for rentals pursuant to ¶ 1.(e) of the Equipment Rental Agreement. However, Satellite was not required to dispose of the equipment and Equipment was not obligated to bear the loss or entitled to receive the gain from a wholesale disposition.

Equipment primarily relies on two cases, *Hannaford Brothers Co. v. State Tax Assessor*, 487 A.2d 251, 40 U.C.C.Rep. 374 (Me.1985), and *In re Catamount Dyers, Inc.*, 43 B.R. 564 (Bankr.D.Vt.1984), in support of its position that the cumulative effect of a variety of indicia of ownership is determinative of a conditional sale. However, both cases are distinguishable and neither supports its position when examined closely. In *Hannaford*, the court found that at the end of the lease term, the lessee would purchase or would cause a third party to purchase the vehicles covered by the contract. In contrast, the Equipment Rental Agreement and the individual Rental Applications in this case do not provide that at the end of the lease term Equipment owns the machines, and they do not obligate Equipment to buy them or cause a third party to buy them. In *In re Catamount Dyers, Inc.*, the court found the "leases" at issues to be conditional sales despite the absence of factors such as 1) the lessee's obligation to buy the goods or automatic ownership of them at the end

of the term; 2) the option to purchase the goods at a nominal price; 3) the lessee's obtaining equity in the property; or 4) the lease term approximating the useful life of the property and the resulting inference that the "lessor" will abandon the property to the "lessee." Nevertheless, the court found that the rental payments were a reasonable equivalent of the cost of the items plus interest, and that the insured value of the machines was roughly equivalent to the full lease price during the life of the lease. 43 B.R. at 568. This is simply not the case here since the $10,000 annual rental is by no means roughly equivalent to even the discounted price of $36,000.

In view of the foregoing and the entire record of the case, the Court hereby finds that the transactions at issue are true leases that were validly terminated by letter dated February 21, 1986. The Equipment Rental Agreement and common law provide clear support for Satellite's decision to terminate the leases for nonpayment of rent. As a consequence, Equipment is hereby ordered to turnover the eleven work platforms and 253 mast sections in its possession to Satellite as soon as commercially reasonable arrangements to do can be made.