**In re REX GROUP, INC., a Delaware corporation, Debtor.**

**AMVEST FUNDING COMPANY, a Virginia corporation, Plaintiff,**

**v.**

**REX GROUP, INC., a Delaware corporation, and Douglas O. Tice, Jr., Trustee, Defendants,**

**and**

**Hunterdon, Inc. and Jane F. Clark, Intervenors.**

Bankruptcy No. 86–00392–R.
Adv. No. 86–0236–R.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Dec. 1, 1987.

Keith Phillips, Richmond, Va., Trustee.

Benjamin C. Ackerly, Richmond, Va., for plaintiff.

Sandy T. Tucker, Richmond, Va., for defendants.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter is before the Court upon the motion of Amvest Funding Company ("Amvest") for relief from the automatic stay imposed by 11 U.S.C. § 362, regarding Rex Group, Inc. ("Rex"), the debtor herein. This relief was sought for the purpose of exercising rights under state law to recover and liquidate assets of the debtor's estate; the assets sought by Amvest consist of horses used by Rex as collateral to secure a loan given to Rex by Amvest and horses leased by Rex from Amvest. Additionally, Hunterdon, Inc. ("Hunterdon") and Jane F. Clark ("Clark") have filed a motion pursuant to Bankruptcy Rule 7024 to intervene in Amvest's relief from stay motion. Upon the entry of an Order by this Court allowing the intervention of Hunterdon and Clark, the trustee Douglas O. Tice, Jr., ("Trustee") filed a cross-claim against the intervenors. On September 3, 1987 Douglas O. Tice, Jr. resigned as the Trustee in Bankruptcy and was subsequently appointed as a Bankruptcy Judge for the Eastern District of Virginia. On September 15, 1987 Keith L. Phillips, Esq. was appointed and began his duties as Trustee in this bankruptcy proceeding.

Upon the convening of a hearing on the motion for relief from stay and on the Trustee's cross-claim, and a trial thereof, and after consideration of numerous briefs filed by counsel and oral argument on the issues, this Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

Rex is a Delaware corporation formed on January 19, 1983. The original directors were Hugh Wiley ("Wiley"), Clyde B. Pitchford, Jr. ("Pitchford"), Joseph A.J. Canada, Jr. ("Canada"), George Morris ("Morris"), and Bertelan DeNemethy ("DeNemethy"). Rex had offices at Pitchford's residence in Richmond, Virginia; the Ocala Jockey Club in Ocala, Florida; and in Atlanta, Georgia. There is dispute among the parties whether Rex had a second place of business in Virginia at Wiley's farm at Oak Hill Plantation, Fluvanna County, Virgi-

nia.[1]

Amvest contends that Wiley's farm was a second place of business of Rex in Virginia. To support this contention, Amvest offered evidence that Wiley's farm telephone number was listed on Rex's business stationery, that Rex received mail from its creditors at Wiley's farm, that a fax machine owned by Rex was kept at the farm to communicate with Rex's Richmond office, and that the horse Hastings, later owned by Rex, was kept at the farm. Additionally, Amvest argues that given the irregular nature of Rex's business and looseness of organization, the connection of its business with Wiley's farm is sufficient to warrant classifying the farm as a place of business for Rex.

This Court must agree with the Trustee who pointed out that the evidence simply does not support Amvest's contention. Amvest offered three letters into evidence which listed Rex's address and telephone number in Richmond and only Wiley's telephone number at his farm. Wiley did not sign any of the letters, and in fact, testified that the Rex stationery listing his farm number was unauthorized; it was used for only six months; and, there was no need to call his farm regarding Rex business. Wiley also testified that the fax machine was used by him for his farming operation and rarely for Rex purposes. Regarding the horse Hastings, Wiley testified that the horse was at his farm for approximately ten days after it was purchased by Wiley and Pitchford individually, and for one month at a later time while owned by Rex. It was also alleged that one other horse was stabled at Wiley's farm for a brief period of time. This Court has concluded that the presence of horses owned by Rex at Wiley's farm is not determinative of whether the farm was used as a place of business by Rex. Wiley stabled horses other than those owned by himself and Rex at his farm, thus, all that can be inferred is that Rex may have benefited from Wiley's contemporaneous involvement in Rex Group and the practice of stabling horses.

Regardless of the irregular nature of Rex's business and the looseness of its organization, the evidence establishes that Rex had only one place of business in Virginia—Pitchford's residence in Richmond, Virginia.

On January 26, 1983, when the relationship between the debtor and Amvest commenced, Rex transferred to Amvest Leasing and Capital Corporation ("Amvest Leasing") a grand prix jumping horse named Hastings for the sum of $100,000. This transfer was evidenced by a bill of sale. On that same day Rex, through Wiley and Pitchford, entered into a lease agreement whereby Rex would lease Hastings from Amvest Leasing. By its terms, the lease provided that Hastings would remain the property of Amvest Leasing. The lease was subsequently assigned by Amvest Leasing to Amvest, the plaintiff herein, on March 25, 1983.

Financing statements covering Hastings and its proceeds were filed by Amvest as follows:

| February 3, 1983 | Circuit Court of Albermarle County, Virginia |
| February 7, 1983 | Circuit Court for the City of Richmond, Virginia |
| February 12, 1983 | Virginia State Corporation Commission |

Pursuant to an addendum dated June 4, 1984 the horses Subtle Smile and Winsage, which had been acquired by Pitchford and Wiley using a loan made by Amvest, were substituted for Hastings under the terms of the lease dated January 26, 1983.[2] Financing statements covering Subtle Smile,

1. The number of places of business maintained by Rex in Virginia is relevant to the place of filing rules governing financing statements in Virginia under Va.Code Ann. § 8.9–401. The propriety of the filings will be discussed at the appropriate time.

2. As indicated *infra*, this Court has determined that the lease was actually a security agreement; thus, the effect of the substitution was to grant Amvest a security interest in Winsage and Subtle Smile and to momentarily give Rex ownership of Hastings free from any security interest of Amvest. Subsequent to the substitution, Rex granted a security interest in Hastings and other horses in exchange for a loan in the amount of $825,000. The resulting security interest of Amvest is evidenced by a promissory note and a security agreement both dated June 7, 1984.

Winsage and their respective proceeds were filed by Amvest as follows:

| | |
|---|---|
| June 14, 1984 | Circuit Court of Goochland County, Virginia |
| June 18, 1984 | Circuit Court of Fluvanna County, Virginia |
| June 14, 1984 | Virginia State Corporation Commission |
| February 27, 1986 | Circuit Court for the City of Richmond, Virginia [3] |

In February, 1985, the horse Millstreet was exchanged for Subtle Smile. In April, 1985, the horse Devonsher was exchanged for Winsage. These horses are now sought by Amvest under their motion for relief from stay based on the argument that they are the proceeds of Subtle Smile and Winsage.[4]

In June of 1984, Amvest loaned Rex $825,000 for the purpose of financing the purchase of grand prix jumping horses. The loan was guaranteed by Canada and his wife, Sandy, Wiley and his wife, Serena, and Pitchford. Part of the loan was used by Rex to pay off the previous loan which had been made by Amvest to Pitchford and Wiley individually for the purchase of Subtle Smile and Winsage.

Rex executed and delivered a promissory note in the principal amount of $825,000 to Amvest on June 7, 1984. Rex also executed a security agreement on that date in which it granted Amvest a security interest in the horses Rio, Brussels, A L'Honneur, Hastings, German Stallion and Rexsum which, together with Millstreet and Devonsher, are the subject of this motion for relief from stay. The security agreement provided that Rex would not sell, trade or transfer any of the horses without the prior written consent of Amvest. Rex also warranted that it had good and absolute title to all of the horses covered by the security agreement.

**3.** February 27, 1986 is the date of the filing of an involuntary Chapter 7 petition in bankruptcy by the Bank of Virginia against Rex Group, Inc. pursuant to 11 U.S.C. § 303.

**4.** The Trustee has not challenged the argument proffered by Amvest that, pursuant to § 8.9-306 of the Va.Code, Millstreet and Devonsher are the proceeds of Subtle Smile and Winsage. Apparently, the Trustee relys upon his basic argu-

Financing statements covering the horses and all their proceeds were filed by Amvest as follows:

| | |
|---|---|
| June 13, 1984 | Circuit Court of Fluvanna County, Virginia |
| June 14, 1984 | Virginia State Corporation Commission |
| June 22, 1984 | Hunterdon County, New Jersey |
| June 27, 1984 | New Jersey Secretary of State |
| February 27, 1986 | Circuit Court of the City of Richmond [5] |

Rex defaulted under the terms of both the lease and the loan, and Amvest made a demand for payment on February 27, 1985. The outstanding balance due and owing Amvest under the terms of the lease is approximately $33,000 and under the terms of the loan approximately $915,000 with accrued interest.

The horse Rio was purchased by Hunterdon, Inc., a corporation owned by Morris, sometime in the summer of 1983. In April, 1984 Rex had Rio vetted at the New Bolton Center of the University of Pennsylvania. Rex paid the expenses of this vetting. The testimony of Wiley and Morris indicates that once Rex had Rio vetted, it had an "interest" in the horse, or at a minimum, an obligation to purchase the horse and a right of first refusal with respect to it.

After the vetting, repeated calls were made by Kathleen Moore ("Moore"), Morris' assistant at Hunterdon, to Pitchford in an effort to ascertain Rex's intentions regarding Rio. In early June of 1984, Pitchford visited Hunterdon and indicated that he was making the necessary financial arrangements to purchase Rio. On July 2, 1984, Rex agreed to purchase, and Morris agreed to sell Rio for the sum of $200,000. A bill of sale was prepared and executed by the parties. Morris also agreed to accept future payment from Rex for Rio.

ment that the lien, if any, was not created until February 27, 1986 which if valid would constitute a voidable preference under 11 U.S.C. § 547. For that reason this Court does not make a determination that the transfer comports with said Va.Code § 8.9-306.

**5.** *See* note 2.

In August, 1984, Rex forwarded a $200,-000 demand note to Hunterdon for the purchase of Rio. Hunterdon's attorney, Edward Bonnie, recommended to Moore that personal guarantees be secured for the note. Moore returned the note to Pitchford requesting the guarantees, however, the note was never returned to Hunterdon. Finally, on December 19, 1984, after repeated attempts by Hunterdon to obtain payment from Rex, a check for $50,000 was sent by Rex to Morris as a down payment on Rio. The check was negotiated by Morris. Despite repeated assurances by Rex that the check for the balance had been mailed, no further payments were made.

Morris, Moore, Wiley and Pitchford met for dinner in Palm Beach, Florida in mid-February, 1985 to discuss Rex's failure to pay Hunterdon for Rio. The testimony of Morris and Moore establishes that Wiley and Pitchford stated at the meeting that Rex could not pay for Rio. At that time, Morris informed Wiley and Pitchford that he intended to return Rex's $50,000 down payment on Rio. Accordingly, a check dated February 22, 1985, marked "check exchange," was mailed to Rex Group at Rex's Franklin Street address in Richmond, Virginia.

Prior to the Palm Beach meeting, Jane Clark had expressed an interest in purchasing Rio and was told by Hunterdon that Rex had a right of first refusal. After Morris met with Wiley and Pitchford, Clark was told by Morris that Rex was not going to purchase Rio. Clark immediately arranged to have Rio vetted in Florida, and within a few days after the successful vetting, a check for $175,000 was delivered to Hunterdon by Clark for the sale of one half interest in Rio.

### Settlement of Ownership of Rio

Throughout this adversary proceeding Hunterdon and Clark have contended that Rex did not have ownership in the horse Rio, but rather, the horse was sold by Hunterdon and Morris to Clark. The Trustee has contended that Morris and Hunterdon had no authority to sell Rio to Clark and that Rio was owned in equal shares by Rex and Clark.

On June 16, 1987 a stipulation of settlement was entered into by and between Amvest, Rex Group, Hunterdon, Clark and Morris. Under the terms of the settlement a check in the amount of $225,000 was to be tendered to the Trustee on behalf of Hunterdon and Clark. Accordingly, title and ownership in Rio, free of all claims of Amvest, Rex Group and the Trustee, was to unequivocally rest in Hunterdon and Clark subject to this Court's approval of said stipulation agreement.

On July 7, 1987 this Court entered an order approving all provisions of the settlement agreement. The order forever extinguished any claims that Amvest, Rex Group and the Trustee had in the horse Rio and further provided that such claims of Amvest, the Trustee and Rex Group relating to Rio be deemed applicable to the settlement amount.[6]

## CONCLUSIONS OF LAW

To prevail on its motion for relief from stay in regard to the $825,000 loan, Amvest must establish that it has a properly perfected security interest in the horses claimed as collateral and that there is cause for lifting the automatic stay. In order to prevail on its request for relief from stay in regard to the lease dated January 26, 1983, Amvest must establish that the lease is a true lease and that Rex is not performing its obligations thereunder. If on the other hand, the lease is found to be a financing

---

**6.** Due to the settlement agreement that resolved the dispute over Rio, this Court does not decide the legal issue arising out of the asserted ownership of Rex and Clark in the horse.

This Court notes, however, that the asserted lack of interest of Amvest in Rio arises solely out of its alleged noncompliance with statutory filing requirements. Additionally, the Trustee in bankruptcy has not asserted a lack of owner-

ship by the debtor as the basis for denying Amvest a security interest in the horse or the proceeds thereof. Rule 8(e) of the F.R.C.P. would allow the Trustee to plead inconsistent defenses in his answer and Rule 15(a) of the F.R.C.P. would allow the Trustee to seek leave of court to amend his pleadings; however, such an issue is not before this Court.

arrangement Amvest must establish that it has a properly perfected security interest in the leased horses and their proceeds and that there is cause for lifting the automatic stay. 11 U.S.C. § 362(d)(1) (1987); *In re Vanas,* 50 B.R. 988 (Bankr.E.D.Mich.1985).

### *Nature of the "Lease" Agreement*

■ The initial inquiry of this Court is whether the lease agreement between Amvest and Rex is a "true" lease, or a conditional sale disguised as a lease in which Amvest has retained title not because it expects return of the goods but rather as security for payment of the purchase price. The "lease or security interest" issue is recognized in § 8.9–102(1)(a), which provides that Article 9 applies "to any transaction, regardless of its form, which is intended to create a security interest in personal property...." The Official Comment to § 8.9–102 further provides that:

> the principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security? ... When it is found that a security interest as defined in section 1–201(37) was intended, this Article applies regardless of the form of the transaction or the name by which the parties may have christened it.

Official Comment to Va. Code Ann. § 8.9–102, n. 1 (Cum.Supp.1987).

Section 8.1–201(37) establishes a test for determining whether an alleged lease is an Article 9 secured transaction, stating in pertinent part:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (á) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Va. Code Ann. § 8.1–201(37) (Cum.Supp. 1987).

When the U.C.C. was initially enacted, it appeared that the test for determining the intent of an instrument regarding a "lease or security interest" issue would be whether the instrument included an agreement that the lessee had the option to purchase the property for a nominal consideration. *K.L.C., Inc. v. Brookside Drug Store, Inc. (In re Brookside Drug Store, Inc.),* 3 B.R. 120, 122 (Bankr.D.Conn.1980). As litigation under the U.C.C. developed, however, it became apparent that omission of an option to purchase for a nominal consideration would not automatically save a lease instrument from being considered a disguised security agreement. *Id.* The developing case law established certain indicia to which the courts have looked to determine whether a true lease existed or whether the agreement was one for a security interest. *Id.* at 122 n. 2 (citing authorities).

A combination of some of the following factors have been relied on by the courts to determine that a lease agreement provided for a hidden security interest: (1) whether the lessee must pay charges, taxes and the like imposed on the leased equipment, (2) whether the lease includes an "acceleration clause" regarding rent payment, (3) whether the goods in question were bought specifically for the lessee involved, (4) whether the lessee was obligated to procure and maintain insurance on the leased property, (5) whether the lessee was required to pay any and all license fees for operation of the equipment, and to maintain the equipment at his expense, (6) whether the agreement placed the entire risk of loss upon the lessee, (7) whether there was a provision in the lease granting the lessee an equity or property interest in the equipment, (8) whether there was a default provision in the lease inordinately favorable to the lessor, and (9) whether there was a provision disclaiming warranties of fitness and/or merchantability on the part of the lessor. *Id.* at 122–23. *See also, In re Pacific Sunwest Printing,* 6 B.R. 408, 412–13 (Bankr.S.D.Cal.1980); *Rish Equipment Co. v. Joe Necessary and Son, Inc. (In re Joe Necessary & Son, Inc.),* 475 F.Supp. 610, 614 (W.D.Va.1979).

The "lease agreement" entered into by Rex and Amvest reads like a model agreement drafted to depict the list of criteria which courts have considered determinative on the issue of a security agreement disguised as a lease. Under the terms of the lease Amvest, as lessor, makes no express or implied warranties of title, merchantability or fitness for a specific purpose and Rex, as lessee, waives any such warranties.[7] Additionally, Rex is required to maintain upkeep and care of the horse(s),[8] procure and maintain insurance on the horse(s) at its own expense,[9] assume and bear the entire risk of loss or damage of the horse(s),[10] pay all taxes and license and regulation fees,[11] and file personal property tax returns and pay all taxes, assessments, fees and penalties which may be assessed on the horse(s).[12]

The lease also contains a default provision that allows Amvest to exercise one or more remedies from a list of nine provided in the agreement.[13] The remedies available range from repossession of the horse(s) with all expenses incurred by the lessor payable by the lessee,[14] to an acceleration of all unpaid rent due and payable immediately upon default.[15] Another clause in the lease provides that any foals which may result from any breeding of the leased horse(s) are the lessee's separate property free of any claim or interest of the lessor.[16] Such a clause seems to create equity in the lessee resulting from the leased property. Any creation of equity in the lessee has been held to be "one of the distinctive characteristics of a lease intended for security." *Bill Swad Leasing Co. v. Stikes (In re Tillery)*, 571 F.2d 1361, 1365 (5th Cir.1978), *cited in Rish Equipment Co.*, 475 F.Supp. at 615.

■ The real nature of a transaction, lease or security agreement, is a question of fact to be resolved by the trier. *K.L.C. Inc.*, 3 B.R. at 122 *citing Tishman Equipment Leasing, Inc. v. Levin*, 152 Conn. 23, 202 A.2d 504 (1964). Based upon the testimony of Coates and Wiley and the manifestation of the parties intent contained in the lease document, this Court acting as the trier of fact, is of the opinion that the lease agreement is actually a security agreement.

### Classification of Collateral

"Article Nine of the Uniform Commercial Code (U.C.C.), responding to the myriad of existing security devices, established a comprehensive statutory scheme for the creation and regulation of security interests. Yet, despite this simplification and clarification of the law, the answers to relatively straightforward questions remain clouded by uncertainty." *Red Carpet Homes of Johnstown, Inc. v. Gerling (In re Knapp)*, 575 F.2d 341, 342 (2nd Cir. 1978). This case presents one such question—how to classify grand prix and/or show jumping horses for purposes of filing financing statements to perfect a security interest?

There is no doubt that the horses in question are considered "goods" under Va. Code Ann. § 8.9–105(h).[17] Further inquiry, however, must be made under § 8.9–109 which provides that "goods" may be classified as "consumer goods," "equipment,"

---

7. *See* Trustee's Exhibit #4 at p. 4.

8. *Id.* at p. 5.

9. *Id.* at p. 6.

10. *Id.*

11. *Id.* at p. 7.

12. *Id.* at p. 8.

13. *Id.* at p. 10–12.

14. *Id.* at p. 12.

15. *Id.* at p. 10.

16. *Id.* at p. 5.

17. "Goods" includes all things which are movable at the time the security interest attaches or which are fixtures as provided in § 8.9–313, but does not include money, documents, instruments, accounts, chattel paper, general intangibles, or minerals or the like (including oil and gas) before extraction. "Goods" also includes standing timber which is to be cut and removed under a conveyance or contract for sale, the unborn young of animals, and growing crops. Va.Code Ann. § 8.9–105(h) (Cum.Supp.1987).

"farm products," or "inventory." Va.Code Ann. § 8.9–109 (1965).

Amvest contends that the proper classification of the horses under § 8.9–109 is inventory held for sale. Goods are inventory "if they are held by a person who holds them for sale or lease." Va.Code Ann. § 8.9–109(4) (1965). The Trustee and the intervenors contend the horses are equipment. Goods are equipment "if they are used or bought for use primarily in business ... or if the goods are not included in the definitions of inventory, farm products or consumer goods." Va.Code Ann. § 8.9–109(2) (1965).

■ The test of the classification of goods under Va.Code Ann. § 8.9–109 is the owner's use of the goods. *Marshall v. Wilton (In re ASW III Builder–Contractor, Inc.)*, 12 B.R. 29, 32 (Bankr.E.D.Va. 1981). The generally accepted rule is that the debtor's stated intended use, at the time of attachment of the security interest, defines the nature of the goods for purposes of ascertaining the proper place for perfecting the security interest. *Martin v. Landers (In re Butcher)*, 43 B.R. 513, 520 (1984), *citing In re Barnes*, 11 U.C.C.Rep. 670 (D.Me.1972). The relevant time to classify collateral for determining the requirement and consequences of perfection is the time surrounding the transaction that originally gave rise to the security interest. *National Business Systems, Inc. v. Borg–Warner Acceptance Corp.*, 792 F.2d 710, 713 (8th Cir.1986), *citing Paccar Financial Corp. v. Benton Trucking Service, Inc. (In re Benton Trucking Service, Inc.)*, 21 B.R. 574, 578 (Bankr.E.D.Mich.1982) (time at which the security interest attaches); *Borg–Warner Acceptance Corp. v. Dugger (In re Teel)*, 9 B.R. 85, 89 (Bankr.N.D.Tex. 1981) (time at which security interest attaches); J. White & R. Summers, Uniform Commercial Code § 23–13 at 943–46 (2d ed. 1980) (time of loan or purchase).

Utilizing the time of the transaction that gave rise to the security interest as the point to determine the owner's use of the collateral furthers the policy behind Article 9. The aim of that policy is to provide a simple, unified structure within which secured financing transactions can be carried out with less cost and more certainty than under pre-U.C.C. law. *See generally* Official Comment to Va.Code Ann. § 8.9–101 (Cum.Supp.1987). To require the creditor to determine the owner's use of the collateral at any other point in time would require the creditor to monitor the debtor's use of the collateral to ascertain its proper classification. *McGehee v. Exchange Bank & Trust Co.*, 561 S.W.2d 926, 23 U.C.C.Rep. Serv. 816, 820 (Tex.Civ.App.1978). *See also Commercial Credit Equipment Corp. v. Carter,* 516 P.2d 767, 13 U.C.C. Rep.Serv. 1212, 1216 (Wash.1973).

■ Extrinsic evidence surrounding the transaction must be used to determine the owner's intended use of the collateral. *National Bank of Commerce v. First National Bank & Trust Co. of Tulsa,* 446 P.2d 277, 5 U.C.C.Rep.Serv. 947, 952–53 (Okla.1968). It has been held that statements in a security agreement are not conclusive evidence of the owner's intended use of collateral. *Id. See also Woodson v. Utica Square National Bank of Tulsa,* 447 F.2d 241, 9 U.C.C.Rep.Serv. 545, 548 (10th Cir.1971). The security agreement, however, is the embodiment of the parties' intentions and the primary source to which a creditor's or potential creditor's inquiry is directed. *See e.g., Commercial Trading Co. v. Bassin (In re Laminated Veneers Co.),* 471 F.2d 1124, 1125 (2nd Cir.1973); *First State Bank v. Maxfield,* 485 F.2d 71, 74 (10th Cir.1973). Thus, any reliance on the security agreement is not misplaced. Evidence contained in the security agreement should, at the very least, be given persuasive effect.

■ In its security agreement with Amvest, Rex warranted that the collateral was "acquired and will be used primarily for business purposes, including but not limited to, the business of breeding, trading, showing or racing horses." [18] Rex also warranted that it would "not sell, trade, or further hypothecate the collateral ... with-

---

**18.** *See* Trustee's Exhibit # 2, at p. 5.

out the prior written consent of Amvest."[19] The lease agreement between Rex and Amvest states that the "lessee [Rex] is engaged in the business of breeding, training and showing horses."[20]

Although not conclusive, the warranties made by Rex in the security agreement and lease agreement indicate that Rex's primary intended use of the horses was for breeding, training, showing and racing. There is no indication that the horses were obtained as an inventory of goods to be sold. This is supported by the fact that Rex was required to obtain prior written approval from Amvest before it could sell any of the horses. The sale of inventory does not contemplate prior written approval of a creditor secured by such inventory. Such a requirement would force the creditor to be available at all times to approve any sale of his collateral. Inventory financing under the U.C.C. does not contemplate such a situation.

Additional evidence of Rex's intended use of the horses is the testimony of Morris, who consistently stated that the horses were for showing, training and breeding. In fact, when asked directly whether Rex was in the business of selling grand prix horses, Morris stated "not particularly." While working for Rex, Morris neither sold a horse owned by Rex nor was he aware of any sale that involved a horse belonging to Rex. Morris believed that the purpose of Rex was to maintain "a select, nice group of horses to show on the road, as we say on the circuit."

To appropriately classify collateral as inventory held for sale, the collateral must be held for immediate or ultimate sale in the ordinary course of business. *See* Official Comment to Va.Code Ann. § 8.9–109, n. 3 (1965). There is no evidence before this Court indicating that Rex ever sold a horse prior to this proceeding. Rex did, however, trade Hastings for Subtle Smile and Winsage, who were later exchanged for Millstreet and Devonsher, respectively. Even so, the trades between Rex and Amvest do not evidence that the horses, collectively, were held for "immediate or ultimate sale." The horses were not goods to be furnished under a contract of service and were not held as stock to be leased to the public at large. Further, the horses cannot be considered as short term materials used to produce end products. *See Id.* Thus, even the use of the collateral after the transaction was entered into provides no indication that the horses were inventory held for immediate or ultimate sale. It simply appears from the record that Rex, namely its officers, intended to train and maintain a stable of grand prix jumping horses to show in the exclusive grand prix circuit and perhaps to breed should the opportunity arise. It is the opinion of this Court that the horses are not inventory held for sale but should properly be classified as equipment. This conclusion is additionally supported by the "catch all" language of § 8.9–109(2), which classifies goods as equipment when it is unable to properly classify them as inventory, farm products or consumer goods. Va.Code Ann. § 8.9–109(2) (1965). *See also In re D'Arcy,* 6 U.C.C.Rep.Serv. 1122, 1123 (Bankr.W.D. N.Y.1968); *Grimes v. Massey Ferguson, Inc.,* 355 So.2d 338, 23 U.C.C.Rep.Serv. 655, 657–58 (Ala.1978).

### *Choice of Law Governing Perfection of Security Interests*

Once the horses have been classified under § 8.9–109, the choice of law to govern the perfection of a security interest in them must be made. The general choice of law rule applicable to all articles of the U.C.C. is found in § 8.1–105, which provides, in essence, that when the parties have not contractually stipulated which state's law will govern, the controlling law will be that of the state to which the transaction bears an "appropriate relation." Va. Code Ann. § 8.1–105(1) (1965). If the parties have stipulated choice of law, that stipulation will control *unless* their rights and duties are governed by one of the sections listed in § 8.1–105(2), in which case the law of the state specified in the listed provision

**19.** *See* Trustee's Exhibit # 2, at p. 2.

**20.** *See* Trustee's Exhibit # 4, at p. 1.

will control. Va.Code Ann. § 8.1–105(2) (Cum.Supp.1987). The perfection provision of the title on secured transaction, § 8.9–103, is listed under § 8.1–105(2), therefore, § 8.9–103 rules will apply.

Section 8.9–103 distinguishes goods which are ordinary from those which are mobile. Mobile goods are defined as "goods which are mobile and which are of a type normally used in more than one jurisdiction ... if the goods are equipment or are inventory leased or held for lease by the debtor to others." Va.Code Ann. § 8.9–103(3) (Cum.Supp.1987). Ordinary goods are defined as "goods other than those covered by a certificate of title ... mobile goods ... and minerals." Va.Code Ann. § 8.9–103(1) (Cum.Supp.1987). It is apparent from the record that the horses are mobile goods, which have already been classified as equipment by this Court. As the Trustee argued and the evidence revealed, the horses' combined itineraries covered at least ten different states and at least five foreign countries during 1984, 1985 and early 1986. Accordingly, it is appropriate for this Court to classify the horses as equipment that are mobile goods.

Because mobile goods may not stay in one place very long, perfection cannot depend upon their location. White & Summers, Uniform Commercial Code § 23–20 p. 987 (2d ed. 1980). Therefore, § 8.9–103(3)(b) chooses "the law ... of the jurisdiction in which the debtor is located [as governing] the perfection and the effect of perfection or nonperfection of the security interest." Va.Code Ann. § 8.9–103(3)(b) (Cum.Supp.1987). Under § 8.9–103(3)(d), "a debtor shall be deemed located at his place of business if he has one, at his chief executive office if he has more than one place of business, otherwise at his residence." Va.Code Ann. § 8.9–103(3)(d) (Cum.Supp.1987). Rex's chief offices, where the business of the company is transacted, is at Pitchford's residence in Richmond, Virginia. Hence, the law of the Commonwealth of Virginia controls the perfection of security interests in the horses.

### Place of Filing Rules For Perfection of Security Interests

Having found that Virginia law applies to the perfection of the security interests in the case at bar, a determination must now be made of where financing statements should have been filed, within Virginia, to properly perfect Amvest's security interest in the horses. Because the collateral in question has been classified as equipment, § 8.9–401(1)(c) is controlling. Section 8.9–401(1)(c) states as follows:

(1) The proper place to file in order to perfect a security interest is as follows:

. . . . .

(c) In all other cases [when the collateral is equipment], in the office of the State Corporation Commission and in addition, if the debtor has a place of business in only one county or city of this Commonwealth, also in the office of the clerk of the court in which deeds are admitted to record of such county or city....

Va.Code Ann. § 8.9–401(1)(c) (Cum.Supp. 1987). In order to properly perfect a security interest in the horses under § 8.9–401(1)(c), Amvest should have filed financing statements both centrally with the State Corporation Commission and locally in the Circuit Court for the City of Richmond. Amvest needed to file locally because this Court has found that Pitchford's residence in Richmond was Rex's only place of business in Virginia. *See Id.*

The records show that Amvest filed financing statements with the Virginia State Corporation Commission on February 12, 1983 for the horses Winsage and Subtle Smile and June 14, 1984 for the horses Rio, Brussels, A L'Honneur, Hastings, German Stallion and Rexsum. Amvest subsequently filed financing statements covering all the horses with the Circuit Court for the City of Richmond on February 27, 1986, the date of the involuntary bankruptcy filing against Rex, but prior in time to the actual filing.[21] It appears that Amvest's purpose

---

**21.** As the parties stated in both their briefs and arguments, and because the financing state-

ments were filed at approximately 9:00 a.m., February 27, 1986 and the petition was filed at

for filing its financing statements at that time was precipitated by their realization that they may have had unperfected security interests in the horses. Thus, although the financing statements were properly filed, thereby technically perfecting Amvest's security interest, the propriety of the filing and perfection is a determination which cannot properly be made by this Court in the context of the pleadings presently before it.

Therefore, it is the opinion of this Court that the collateral at issue herein is properly classified as equipment which are mobile goods, thus, requiring both central and local filings in order to perfect the security interests in said collateral. However, the failure of Amvest to timely file financing statements to perfect its security interest in the horses may be a defect which strikes at the heart of its relief from stay motion. Consequently, because the potential avoidability of the lien(s) created by the February 27, 1986 filing of financing statements by Amvest at the Circuit Court of the City of Richmond has not properly been raised by the defendants, this Court reserves its determination on such an issue and any concomitant need to lift the automatic stay.

The parties herein shall submit a proposed order in conformity with this opinion.

4:58 p.m., February 27, 1986, the financing statement falls within the 90–day preference period and *may* constitute a preferential transfer avoidable by the trustee under § 547(b). However, the issue was never raised in the pleadings of this case, nor was a separate adversary proceeding instituted by the Trustee to avoid the transfer. Hence, this Court's determination of whether relief from stay is warranted, after determining the other issues in the case, hinges upon whether an avoidable preferential transfer exists.